```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS



                                 )
UNITED STATES OF AMERICA,        )
                                 )        Criminal Action
          Plaintiff,             )        No. 16-40031-TSH
                                 )
v.                               )
                                 )
JACKLYN M. SUTCIVNI,             )
                                 )
          Defendant.             )
                                 )




            BEFORE THE HONORABLE TIMOTHY S. HILLMAN
                 UNITED STATES DISTRICT JUDGE

                     JURY TRIAL DAY TEN

                TESTIMONY OF JACKLYN SUTCIVNI


                     July 23, 2021


              United States District Court
                   Courtroom No. 2
                   595 Main Street
               Worcester, Massachusetts
```

Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way
Boston, Massachusetts  02210
mortellite@gmail.com

1    APPEARANCES:

2    On Behalf of the Government:
     Michelle L. Dineen Jerrett
3    Danial E. Bennett
     U.S. Attorney's Office - MA
4    595 Main Street
     Suite 206
5    Worcester, MA 01608
     508-368-0102
6    Michelle.Dineen.Jerrett@usdoj.gov

7    On Behalf of the Defendant:
     Joseph M. Griffin, Jr.
8    Joseph M. Griffin, Jr., Attorney at Law
     15 Court Square
9    Suite 240
     Boston, MA 02108
10   617-742-1663
     josgriffin@msn.com
11
     Frank C. Corso
12   Corso Law LLC
     492 Winthrop Street
13   Suite 5
     Rehoboth, MA 02769
14   774-901-2677
     fcc@corsolaw.com
15

16

17

18

19

20

21

22

23

24

25

<u>INDEX</u>

<u>WITNESS</u>                                                              <u>PAGE</u>

JACKLYN M. SUTCIVNI, Resumed

   Direct Examination By Mr. Griffin                               8
   Cross-Examination By Ms. Dineen Jerrett                        65


<u>E X H I B I T S</u>

<u>Exhibit No</u>.                    <u>Page</u>

   550                           43

   456                           80

   490                           87

   491                           93

   492                           97

   454                          103

   455                          103

   167                          120

```
 1                  P R O C E E D I N G S

 2         (The following proceedings were held in open court before

 3    The Honorable Timothy S. Hillman, United States District Judge,

 4    United States District Court, District of Massachusetts, on

 5    July 23, 2021.)

 6              THE COURT:  Good morning.

 7              MS. DINEEN JERRETT:  Good morning, Your Honor.

 8              MR. GRIFFIN:  Good morning.

 9              THE COURT:  So on the government's motion to ask me to

10    reconsider my ruling on Exhibits 215 et seq. and 81, I am

11    denying the motion on 81, which is the diary, but I am going to

12    grant the motion on 215 et seq. under that exception 1 to 803.

13    However, I'm going to ask you both to just go through and make

14    sure it's sanitized.  And I presume the yellow magic marker was

15    the government's and not the witness's?

16              MS. DINEEN JERRETT:  The highlighting, Your Honor?

17              THE COURT:  Yes.

18              MS. DINEEN JERRETT:  Yes, so we can --

19              THE COURT:  So that comes out.

20              MS. DINEEN JERRETT:  Absolutely.

21              THE COURT:  Then you two need to talk about anything,

22    any issues.  I know there was something about indictments that

23    needed to be redacted.

24              MR. GRIFFIN:  If I may, I gave this issue a little bit

25    more thought last night.  Would you indulge me briefly?
```

1          THE COURT:  Sure, yeah.

2          MR. GRIFFIN:  Drawing your attention specifically to

3    Exhibit 215, Ms. Honig's notes, you know, originally we were

4    analyzing this under recorded recollection, and of course we

5    understood it was only admissible if I were to offer it.  We

6    then, the United States asked us to consider this as a present

7    sense impression.  And that, I would suggest, implicates a

8    statement describing or explaining an event or condition.

9          A statement is defined in 801(a), as everyone in the

10   court can agree, "A statement means a person's oral assertion,

11   written assertion or nonverbal conduct if the person intended

12   it as an assertion."  So if it's a statement and not a record,

13   and I think it's a record, but if it's a statement, then I

14   think there needs to be an exception to the hearsay rule.

15         And considering that, I think you need an exception

16   for everything here.  And what we have is a statement as

17   memorialized in the notes from Jim Levin who is not on trial

18   that's being offered against my client, and it's after the

19   conspiracy ended.

20         So I would just respectfully note a case that I

21   thought had some relevant analysis, which is *United States v.*

22   *Ferber*, 966 F. Supp. 90.  It's a Judge Young decision that has

23   a pretty good analysis of sort of the hearsay line of rationale

24   that I'm explaining to you.

25         THE COURT:  Okay.  Do you want a couple -- I'm happy

1   to read it.

2            MR. GRIFFIN:  I appreciate that.

3            THE COURT:  Because we've got some time.  Do you want

4   to take a peek at it?

5            MS. DINEEN JERRETT:  I would, Your Honor.  I don't

6   know that one off the top of my head, so I appreciate that.

7            THE COURT:  This is turning into a sadistic bar exam

8   question.  Ms. Dineen Jerrett, for Mr. Castles' purposes, what

9   are the exhibit numbers?

10           MS. DINEEN JERRETT:  For the Ms. Honig documents?

11           THE COURT:  Yes.

12           MS. DINEEN JERRETT:  So it would be -- I just want to

13  make sure.  I'm comparing it.  If you disagree with me --

14           THE COURT:  The ones I was given, let me just start.

15  I've got 215.

16           MS. DINEEN JERRETT:  I agree with 215.

17           THE COURT:  I've got 217.

18           MS. DINEEN JERRETT:  Correct.

19           THE COURT:  I've got 221.

20           MR. GRIFFIN:  Agreed.

21           THE COURT:  222.

22           MR. GRIFFIN:  Yes.

23           THE COURT:  224, 225.

24           MR. GRIFFIN:  Yes.

25           THE COURT:  227.

```
 1              MS. DINEEN JERRETT:  And 229.

 2              THE COURT:  229.

 3              MR. GRIFFIN:  I agree.

 4              THE COURT:  Those are what I was given.

 5              MS. DINEEN JERRETT:  Yes.

 6              THE COURT:  Let me just check.  Do we have jurors?

 7      They're all here.  All right.  Let's bring them in.

 8              MS. DINEEN JERRETT:  Thank you, Your Honor.

 9              MR. CORSO:  Should the witness get on the stand?

10              THE COURT:  Yes.

11              (Jury enters the courtroom.)

12              COURTROOM CLERK:  Court is open.

13              THE COURT:  I will note several of you have broke out

14      the down vests and hat and mittens.  Has anybody had any

15      difficulty following my instructions not to discuss the case

16      with anyone, including each other?

17              (Negative response.)

18              Has anybody seen or heard or read or overheard

19      anything that would bear upon your service?

20              (Negative response.)

21              Finally, is there anything bearing on your jury

22      service you would like to bring to my attention?

23              (Negative response.)

24              All right.

25              MR. GRIFFIN:  If I may, Your Honor?
```

 1              THE COURT:  You may.  And Ms. Sutcivni, I'm just going
 2      to remind you that you are still under oath from yesterday.
 3              THE WITNESS:  Yes, Your Honor.
 4              MR. GRIFFIN:  Thank you.
 5                  JACKLYN M. SUTCIVNI, Resumed
 6      DIRECT EXAMINATION BY MR. GRIFFIN:
 7      Q.   Good morning, again.
 8      A.   Good morning.
 9      Q.   I'd like to just pick up where we left off yesterday.
10      When we broke, I believe we were talking about your first
11      meeting with Jim Levin.  Do you remember that?
12      A.   Yes.
13      Q.   Let's just recap a little bit.  Where was the meeting?
14      A.   It was in the conference room of my office at 44 Front
15      Street.
16      Q.   Okay.  And who was there?
17      A.   It was myself, Mr. Levin, Mr. Curtis Mueller, Denys Levin.
18      There was another young man.  I don't remember his name, and I
19      didn't see him again.  And Patrick Murphy.
20      Q.   Okay.  And Patrick Murphy was involved in the NSP side of
21      things for the City of Worcester?
22      A.   Yes.  He was the program manager.
23      Q.   Okay.  And at that point did you have an understanding
24      about what Curtis Mueller's role was?
25      A.   He was introduced as the gentleman that would be putting

1   up security cameras, securing the property and doing marketing.

2   Q.   And were there any other applicants for the NSP program

3   that you or people from your office met with, if you know?

4   A.   At that time I was meeting with investor owners, so every

5   investor owner that approached Mr. Murphy about potentially

6   participating in the program I would sit in on the meetings

7   with.

8   Q.   And Mr. Murphy was involved in the real estate side of

9   things?

10   A.   He was the program manager, so all sides of things.

11   Q.   Okay.  How many other applicants for the NSP program do

12   you think you met with?

13   A.   I would say probably at least 15 to 20.

14   Q.   Okay.  And at some point did applications begin rolling

15   in?

16   A.   Yes.

17   Q.   Do you remember when that was?

18   A.   It would have been sometime between August of 2010 and

19   December 2010.  We did receive later applicants as well, but

20   the majority of applications came in from investors anyway

21   between August and sometime in December.

22   Q.   Okay.  Did you have any role in the application process?

23   A.   No, other than meeting with investors to essentially

24   describe the difference between NSP and other city-funded

25   programs.  Mr. Murphy was managing the application process.

1  Q.   Okay.  Did you have any role in sort of the vetting

2  process?

3  A.   Yes.  As the coordinator, I was offering my

4  recommendations for prioritizing properties based on the city

5  manager's outlined plans, angles and future redevelopment of

6  certain locations.

7  Q.   Okay.  That sounds like it relates to properties and not

8  people who would be selected to redevelop or rehabilitate those

9  properties; is that right?

10  A.   That's correct.

11  Q.   What about the selection of independent developers or

12  contractors; did you have any say in that?

13  A.   Only to the extent that I would ask Mr. Murphy if he

14  ensured that they were qualified by all of the qualification

15  process.

16  Q.   Okay.  And how many sort of properties were available for

17  NSP funding in the City of Worcester, if you remember?

18  A.   The number of properties would be impossible for me to

19  give you.  It was every property located within certain census

20  tracts.

21  Q.   Was one of those 5 May?

22  A.   Yes.

23  Q.   And who was it that sort of designated these properties as

24  eligible for NSP financing?

25  A.   Ultimately it would have been Patrick Murphy and myself

1   through a determination of an application for a particular

2   property, but the properties were identified, essentially there

3   were certain properties identified by the city manager as a

4   targeted property.

5   Q.   Where did 5 May fall in in that spectrum?

6   A.   5 May was a targeted property as a result of significant

7   federal investment that went into its neighbor located at 9

8   May.

9   Q.   Okay.  So at some point 5 May becomes an actual project,

10  correct?

11  A.   Correct.

12  Q.   And was Jim Levin selected for the 5 May Street project?

13  A.   Jim Levin applied specifically for the 5 May.  The City

14  did not select certain developers for certain addresses.

15  Q.   Okay.  Then you became -- you were handed that 5 May

16  Street project; is that fair?

17  A.   Yes.

18  Q.   And was that the only project that you were working on?

19  A.   No.

20  Q.   How many NSP properties were you dealing with at the time?

21  A.   At that time, between September and December, I would say

22  there were at least ten.

23  Q.   That you were handling?

24  A.   That I was involved in in some way or another.  Most

25  time -- I was involved in all of them as the coordinator but at

1    a higher level.  So I was attempting to coordinate the funding

2    so that there was a strategic impact, meaning we were trying

3    not to just scatter polka dots all over the city.  We were

4    trying to have a meaningful impact in particular neighborhoods.

5    Q.    Okay.  So you were dealing with more than one project at

6    one time?

7    A.    Yes.

8    Q.    Now, had you ever taken a property all the way through

9    this NSP process prior to this?

10   A.    No.  The funding source was new.

11   Q.    What about the City of Worcester then?

12   A.    No.

13   Q.    Okay.  So what were the first steps that you took once

14   there was a conditional commitment to 5 May and once it sort of

15   got up and running?

16   A.    So the conditional commitment is just that, conditional.

17   I guess I could equate that to like a prequalification for a

18   mortgage.  It essentially says if everything you told us was

19   true, we're willing to provide this amount of funds.

20         But then there's a lot of work that actually goes into

21   verifying all of the information that we obtained.  So

22   Mr. Murphy would be collecting most of that.  My job for 5 May

23   was attempting to coordinate with outside vending sources for

24   the balance of the property.

25   Q.    Okay.  Were you successful in doing that?

 1  A.   In directing at least certain funding sources and

 2  encouraging outside funding sources to find, yes.

 3  Q.   And in terms of how the program worked, we've seen these

 4  AIA forms.  Do you recall using those?

 5  A.   Yes.

 6  Q.   Okay.  And we saw the G7O2 and G703.  Do you remember that

 7  throughout this trial?

 8  A.   Yes.

 9  Q.   And what was your understanding about the use of the two

10  forms, the G702 and G703?

11  A.   As I was attempting to implement this program, in my

12  experience prior with the lead program, it was important that

13  there be a certification of the dollar amount requested, not

14  necessarily, you know, per AIA exactly what work was happening.

15       Those documents in my understanding were in fact backup

16  documents, so the City did collect completed AIAs for another

17  funding source, but those AIAs are a backup to the payment

18  request.  It's not a payment request itself.

19  Q.   Okay.  And the AIA form, the first page, the 702, is there

20  a certification on that page, if you recall?

21  A.   Yes, there is a certification.  Typically the AIA is a

22  form that is provided from the contractor to an owner or a

23  developer.  And then it is further certified by an architect.

24  In this case we actually changed the form itself to reflect

25  owner so that it was essentially a certification from the owner

1    of the property that they were requesting a certain dollar

2    amount of funds.

3    Q.    Okay.  And so what did that certification mean to you on

4    the G702, the first page of the AIA?

5              MS. DINEEN JERRETT:  Objection.

6              THE COURT:  Overruled.

7    A.    It meant that the owner of the property was requesting

8    that particular dollar amount and was essentially verifying to

9    me that they believed that dollar amount was owed.

10   Q.    Okay.  Let's take the first AIA for instance.  Do you

11   recall that coming in?

12   A.    Yes.

13   Q.    And how would it get to you?

14   A.    They were typically either mailed in or dropped off

15   because we required a hard pen signature.  We did not accept

16   photocopies.

17   Q.    Okay.  And the G702, the G703, what was your understanding

18   about how that worked?

19   A.    The G703 was in my understanding going to be a tool for

20   Bob Shaw who was the rehab specialist.  So he early on in the

21   program had suggested the use of this particular AIA to assist

22   him in his inspections.  He would be able to track work using

23   that.  And whatever tool helped him to do his job best, I was

24   fine with him using.

25   Q.    Did you have an understanding about which forms were

1    required pursuant to the loan agreement, the contract?

2    A.    Yes.

3    Q.    What was it?

4    A.    The loan agreement requires that the owner developer,

5    whoever is receiving payment, keep copies of all records

6    available on-site for review upon request.

7    Q.    Are you talking about the documents that are attendant to

8    the AIA forms that go with it?

9    A.    Typically, as I said, an AIA form is submitted by a

10   contractor to an owner, and it's a request from the contractor

11   going to the owner requesting payment for the work.

12         So in the case of at least NSP, there would be nothing

13   really to go along with that other than Mr. Shaw's or the rehab

14   specialist's inspection, which also required the signoff saying

15   that the work had been viewed by somebody qualified.

16   Q.    And of course -- do you remember when Mr. Shaw left his

17   employment with the City of Worcester?

18   A.    I believe it was, I want to say maybe October, October of

19   2010.

20   Q.    Okay.

21   A.    Before -- actually, I'm sorry.  It could have been before

22   that.

23   Q.    So what would you receive in terms of AIA documents,

24   payment documents, what would you receive?

25   A.    I would receive the 702.  In cases where it was a

1    contractor submitting that to the owner, usually the 702 was

2    also attached.

3    Q.   And did you receive 702s and 703s in this case?

4    A.   Yes.

5    Q.   Okay.  What about things like invoices, receipts, this

6    kind of thing?

7    A.   For the first payment, all of the backup was attached.

8    Q.   Okay.  And what did you do with it?

9    A.   I moved the payment forward, so I printed what's called a

10   PCR, Project Cash Request form, and I signed that form in the

11   place of the program manager whose position had vacated.  By

12   then Mr. Murphy was essentially wrapping up.  He left several

13   weeks before Mr. Shaw.  And then I forwarded it to Dennis

14   Hennessy for signature.

15   Q.   Okay.  What went with it, anything?

16   A.   The first one was everything I received with it.  I just

17   forwarded --

18   Q.   And from there, do you know where it went?

19   A.   Then it gets picked up usually in interoffice mail and

20   goes over to City Hall Budget Office.

21   Q.   Okay.  And we're talking about the first AIA form in the

22   project, correct?

23   A.   Yes.

24   Q.   Okay.  What, if you remember, was that seeking?

25   A.   It was seeking funds for the acquisition and soft costs.

1   Q.   Okay.  And did you do anything when you received that form

2   in terms of looking at items or verifying anything?

3   A.   No.

4   Q.   Did you speak with anybody?

5   A.   I had been speaking with Andy Howarth who was the

6   consultant rehab specialist working for CHR, WCHR, Worcester

7   Community Housing Resources, who was going to be ultimately the

8   owner of the property at the completion of renovation.

9   Q.   Now, do you recall if there were any items in there for

10  other things besides acquisition-type things like rough

11  carpentry or anything like that?  Do you recall that?

12  A.   I don't recall specifically.

13  Q.   Okay.  What about the second AIA form?

14  A.   The second AIA form came in the same way.  I guess it's

15  important for me to note that the first AIA form when it

16  was circulated --

17          MS. DINEEN JERRETT:  Objection.

18          THE COURT:  Sustained.

19  Q.   Let's just stay on -- let me go back for a second.  The

20  first AIA form that you submitted, did it go through initially?

21  A.   No.

22  Q.   What happened?

23  A.   It was returned by the budget office.

24  Q.   Do you know why?

25  A.   Because the form in the architect certification line had

1    N/A, not applicable.

2    Q.    Did it come to you?

3    A.    Yes.

4    Q.    What did you do?

5    A.    I contacted Ms. Vecchio to essentially discuss and

6    inquire.

7    Q.    And then what happened?

8    A.    After discussion, Ms. Vecchio informed me that that line

9    in the architect's signature could not be blank.

10   Q.    So what did you do?

11   A.    Ultimately held a meeting, a brief meeting with

12   Ms. Vecchio and Mr. Levin in the budget office to discuss how

13   to help to comply with what she's asking me and still move the

14   project forward.

15   Q.    And what became of that meeting?

16   A.    She just informed me that the owner or developer --

17           MS. DINEEN JERRETT:  Objection.

18           THE COURT:  Sustained.

19   Q.    Without telling us what people told you, what happened as

20   a result of this meeting?

21   A.    Mr. Levin signed in the architect signature line, crossing

22   out "architect" and writing in "owner."

23   Q.    And moving on to the second AIA form, what was that

24   requesting payment for, if you remember?

25           THE COURT:  Mr. Griffin, if you could, can you refer

1    to them by exhibit number as well.

2              MR. GRIFFIN:  I apologize, Your Honor.  I'd be happy

3    to.  Exhibit 16, please.  Mr. Castles, I believe Mr. Marshall

4    needs your assistance.

5              COURTROOM CLERK:  Sorry.

6    Q.   Do you recognize this Exhibit 16?

7    A.   It appears to be a payment request for 5 May Street.

8    Q.   Okay.  And does it appear to be the second one?

9    A.   It is marked as the second one.

10   Q.   Okay.

11   A.   However it's --

12   Q.   I'm sorry.  Go ahead.

13   A.   The dollar amount is written in in pen in item number 4,

14   and the balance to finish, I don't think those would add to the

15   amount of the contract.  This may have been a draft of some

16   kind.

17   Q.   Okay.  Can we see the next page.  Are you able to see

18   that?

19   A.   Yes.

20   Q.   Okay.  And with regard to some of the line items of things

21   done this period, do you have an explanation as to things like

22   rough carpentry, finish carpentry, as to what those values

23   mean?

24              MS. DINEEN JERRETT:  Objection.

25              THE COURT:  Overruled.

```
 1    A.    Typically they would refer to just that.  A rough
 2    carpentry is generally all of the framing, is my understanding.
 3    Finish carpentry I would presume would be hanging doors.  You
 4    know, I don't -- I'm not an architect.  I would just kind of,
 5    that would be my assumption.
 6    Q.    Okay.  And do you know what they meant with regard to this
 7    specific AIA request?
 8    A.    It looks like here, it looks like there's a request for a
 9    certain dollar amount for those particular line items.
10          MS. DINEEN JERRETT:  Objection, Your Honor.  Move to
11    strike.  He asked if she knew, and her response was, "It looks
12    like."
13          THE COURT:  Sustained.
14          MR. GRIFFIN:  Okay.
15    Q.    Were there any invoices, receipts, backup documentation
16    for this AIA request, if you recall?
17    A.    Yes.
18    Q.    And did you see them?
19    A.    Yes.
20    Q.    Where did you see them?
21    A.    They were attached to the AIA, and this does not reflect
22    the AIA for the second payment.
23    Q.    It's different?
24    A.    It is different.
25    Q.    In what way?
```

1    A.    The second payment, the second sheet of that had -- it

2    continued to list soft costs because some of the second payment

3    costs that were being drawn that had the invoices attached were

4    reflected in the G703.

5    Q.    Okay.  What does that mean to you?

6    A.    I think that this might be a draft of some kind.  This

7    does not appear to be the payment mechanism.

8    Q.    Okay.  Let's see Exhibit 17.  Do you recognize Exhibit 17?

9    A.    No.

10   Q.    You don't think you've ever seen that document before?

11   A.    No.

12   Q.    What about page 2, do you recognize that?

13   A.    I do not.

14   Q.    You don't remember receiving that document in this case?

15   A.    No.  I did receive a third payment, but this is not it.

16   Q.    What's different about it?

17   A.    Can you get back to the first page, please.

18   Q.    Please.

19   A.    If you look at item number 4, "Total completed and stored,

20   1.4 million," essentially for the third payment, that amount of

21   funding had not been drawn yet.  Jane Bresnihan appears to sign

22   as the notary, which was unlikely.  I won't say it's

23   impossible, but she also -- there's no stamp, so we would have

24   required the notary stamp for sure.  And this actually looks

25   like it might be a form that somehow ended up with Dori.  It

1    appears to have -- this looks like Dori's initials.

2              MS. DINEEN JERRETT:  Objection.

3              THE COURT:  Sustained.

4    Q.   I just want you to answer the question that's sort of put

5    to you, okay?

6         All right.  But you did receive AIA forms in the 5 May

7    case; is that fair?

8    A.   Yes.

9    Q.   Okay.  And when you received them, and we're talking about

10   exhibits -- the payments that represent Exhibits 18, 19, 20 and

11   21, did you get attendant documents with them, invoices,

12   receipts, that kind of thing?

13   A.   No.

14   Q.   Where were those documents?

15   A.   They were on-site.  They're required to be kept on-site by

16   the loan agreement.

17   Q.   "On-site" meaning where?

18   A.   At 5 May Street.

19   Q.   And so would you inspect them?

20   A.   I would do walkthroughs of the property to ensure that

21   work was moving.  And yes, I would not look through every

22   invoice and add them up with a calculator, but I would thumb

23   through and make sure that there was some documentation at

24   least to my satisfaction in order to put the payment through.

25   Q.   And did you have any experience with architecture or

1    construction?

2    A.    No.

3    Q.    And did you walk through the whole building?

4    A.    Yes.

5    Q.    Okay.  And then what did you do?  After that, what

6    document if any did you prepare for the city?

7    A.    I prepared the PCR, the project cash request.

8    Q.    Okay.  And with regard to certain of the line items in

9    Exhibits 15 through 21 of the AIA forms, the G703s, are you

10   familiar with this?  You've heard testimony about this idea

11   that funds were advanced?

12   A.    Yes.

13   Q.    What do you have to say about that?

14   A.    I structured the NSP program as I was implementing it to

15   allow for payments essentially to mirror what was called

16   industry standard.  It's a third of the payment up front before

17   work begins, a third of the payment halfway through, and then a

18   third of the payment at the end.

19        So advances were written into the loan agreements to in

20   fact be allowed, and every NSP property, as best I remember,

21   received an advance payment for the first payment.

22   Q.    Okay.  So now going back to the PCR -- if we can see the

23   PCR for Exhibit 17 -- is this the document you're talking

24   about?

25   A.    This is a PCR, yes.

1   Q.   And is this a document that you would sign?

2   A.   Yes.

3   Q.   And what would you do with it when you signed it?

4   A.   I would forward it to Dennis Hennessy for signature.

5   Typically there would be a housing director that would sign.

6             MS. DINEEN JERRETT:  Objection.

7             THE COURT:  Sustained.

8   Q.   I want you to just answer the question, and we'll ask as

9   many questions as we need.  So what would you do with this

10  form?

11  A.   I would forward it to Dennis.

12  Q.   Then what became of it, if you know?

13  A.   It would be circulated to budget.

14  Q.   And would a check initially issue or eventually issue?

15  A.   Yes.

16  Q.   Or a payment, I should say?

17  A.   Yes.

18  Q.   And did you have any authority to issue any payments?

19  A.   No.

20  Q.   And you heard the testimony from Ms. Taylor about going

21  into various systems to create claims.

22  A.   (Nonverbal response.)

23  Q.   You need to answer out loud.

24  A.   Yes.

25  Q.   Okay.  And would you do that?

1    A.    On occasion, yes.

2    Q.    And why would you do that?  At what point would you do

3    that?

4    A.    The electronic systems for NSP had what's called a check

5    and balance essentially between programatic and budgetary.

6    Essentially it keeps all people honest.

7          So I would receive a dollar amount from Ms. Vecchio

8    itemizing the payments that she had issued over the quarter,

9    and she would send that to me and ask me to essentially review

10   and then create the programatic voucher in the systems.  So it

11   meant that these addresses and these dollar amounts --

12          MS. DINEEN JERRETT:  Objection.

13          THE COURT:  Sustained.

14   Q.    I want you to just succinctly, if you can, explain to the

15   jury the reason that you would go into these various systems to

16   create claims or whatever task it was that you were doing.  And

17   I'm talking about your actions in that regard pursuant to the

18   submission of these AIA forms to budget towards the end of the

19   process.

20   A.    The system required that.  So logins were given for

21   everybody who had access to the system.  The budget department

22   was the only department that could log in to the budgetary

23   forms, so budget could not log in to the program, which was

24   required to generate the form itself.

25   Q.    Is that a check and balance?

1    A.    Yes.

2    Q.    Would someone direct you to do that?

3    A.    Yes.

4    Q.    Who would that person be?

5    A.    Dori Vecchio.

6    Q.    Okay.  And we heard a lot about this Davis-Bacon.  Do you

7    have an understanding about what that was?

8    A.    Yes.

9    Q.    What's your understanding?

10   A.    Davis-Bacon is prevailing wage.  It requires that

11   everybody working in the trades on the property be paid

12   prevailing wage.

13   Q.    Okay.  What was your role in terms of the Davis-Bacon

14   prevailing wage in the 5 May project?

15   A.    My role was to submit, I guess it's a request for wage

16   determination to the state office that does that.  They return

17   the most current and accurate required hourly rates for the

18   location, for the City of Worcester in this case, and my job

19   was to monitor Davis-Bacon on that particular job.

20   Q.    Okay.  And how did you monitor it?

21   A.    I would go to the site typically monthly.  I was to

22   interview every employee on-site.  There's a form, it's an

23   actual form where questions, very particular questions are

24   required.  I would record the answers.  They would sign and I

25   would sign.

1    Q.   So did you report information that was given to you by

2    other people?

3    A.   Yes.

4    Q.   Okay.  And then would you report that to the City of

5    Worcester?

6    A.   Yes.  The second part of the monitoring was then --

7              MS. DINEEN JERRETT:  Objection.

8              THE COURT:  Sustained.

9              MR. GRIFFIN:  I think we understand that.

10   Q.   Now, at some point did you become a property-owner in the

11   City of Worcester?

12   A.   Yes.

13   Q.   Do you remember when that was?

14   A.   It was at the very end of December 2010.

15   Q.   Okay.  At some point did you become what's known as an

16   EM-level position at the City of Worcester?

17   A.   Yes.

18   Q.   Do you remember when that was?

19   A.   There's some confusion about the dates.  So it appears, my

20   understanding was that I became the actual EM in July of '11.

21             MS. DINEEN JERRETT:  Objection.

22             THE COURT:  Sustained.

23   Q.   Do you know or not when you became an EM-level employee in

24   the City of Worcester?

25   A.   July of '11.

1    Q.   Was it before or after you bought your condo?

2    A.   It was after.

3    Q.   Okay.  And were you aware of a residency requirement in

4    the City of Worcester for EM-level employees?

5    A.   I became aware, yes.

6    Q.   So you were aware that it existed?

7    A.   Yes.

8    Q.   And when you bought your condominium -- and by the way,

9    where did you buy it?

10    A.   At 21 Illinois Street, Unit 504.

11    Q.   Were you subject to that residency requirement when you

12    purchased the condominium?

13    A.   No.

14    Q.   And did you have an understanding about what the resident

15    requirement was?

16    A.   Not when I purchased.

17    Q.   Okay.  Do you have one now?

18    A.   Yes.

19    Q.   And what is it now?

20    A.   My understanding is that residency is required for all EM

21    positions, executive management.  And those are very specific

22    positions that are outlined in the annual city budget.

23    Q.   Okay.  So Unit 504, 21 Illinois Street, when you were

24    looking at properties, was that the first property that you

25    looked at?

A.    No.

Q.    Do you remember what the first property that you looked at was?

A.    It was a two-family property located near Crystal Park.

Q.    Okay.  And why were you looking for a property in the City of Worcester?

A.    I had a teenage daughter that I home-schooled looking for early college, and Clark University was offering free tuition for anybody who lived, I believe it was within a ten-mile radius of the campus.

Q.    And did the 21 Illinois Street property line up with that?

A.    Yes.

Q.    Was there anything about the building itself that was sort of attractive to you?

A.    That neighborhood, Main South, has its challenges.  It is a lower-income neighborhood, and that particular area around Clark has fairly significant crime.  The building at 21 Illinois Street was very secure.  It was an old mill building made of cement, and it had several door locks to get in, and it seemed very safe for my teenage daughter who would be living in the neighborhood.

Q.    Okay.  And did you have an expectation of also spending time there?

A.    Yes.

Q.    How would that have worked out and why?

1    A.   I was still living in Dracut, and the weather,

2    particularly in the winter, in Worcester is very harsh.   And

3    the commute was long and treacherous.   And I wanted to bring my

4    daughter closer as well because I was working very long hours

5    and barely saw her.

6    Q.   Okay.   So the first property that you looked at was on

7    Crystal Street.   Was there another property or properties that

8    you looked into prior to settling on Unit 504?

9    A.   Yes, I actually viewed another condo at another condo

10   building located just down the street.   I don't remember the

11   name of that building, but I viewed a unit there, and then I

12   also viewed another unit in 21 Illinois Street, Unit 206.

13   Q.   Okay.   And did you understand who owned that unit, Unit

14   206?

15   A.   Yes.

16   Q.   Who?

17   A.   It was owned by 21 Illinois Street, LLC.

18   Q.   And what understanding did you have about who was involved

19   in 21 Illinois Street, LLC?

20   A.   Mr. James Levin.

21   Q.   Okay.   Is that the same James Levin from the 5 May Street

22   project?

23   A.   It is.

24   Q.   Did you buy that unit?

25   A.   I did not.

1    Q.    Why not?

2    A.    Because Mr. Levin had a project that I was working on, it

3    would be essentially a conflict of interest.  So I sought legal

4    counsel from David Moore who was the city solicitor to inquire

5    about how I might go about doing that and ultimately decided,

6    as a result of that conversation, to not purchase.

7    Q.    To not purchase Unit 204?

8    A.    206.

9    Q.    I'm sorry, 206.

10   A.    Correct.

11   Q.    Did you eventually purchase a unit at Illinois Street?

12   A.    I did.

13   Q.    Is that this Unit 504?

14   A.    Yes.

15   Q.    And we're obviously talking about the same building,

16   correct?

17   A.    Correct.

18   Q.    And who owned that unit, 504?

19   A.    Curtis Mueller.

20   Q.    And is this the same Curtis Mueller that you met at the

21   very outset of the 5 May Street project?

22   A.    Yes.

23   Q.    Okay.  And did you have any concerns about Curtis Mueller,

24   buying a unit from Curtis Mueller?

25   A.    Not really.

1   Q.   Why is that?

2   A.   Because Curtis Mueller was -- he had no financial interest

3   in the project at 5 May Street.  I was certain of that through

4   verification that I had done to see who owned the LLC.

5   Q.   Which LLC?

6   A.   The 5 May Street, LLC, and he also had not had any

7   participation in the project since April of 2010, putting it

8   more than six months, which is the requirement under the state

9   ethics law.

10  Q.   At the time you bought Unit 504, did you understand or

11  know that Curtis Mueller had bought it from Jim Levin?

12  A.   I did not.

13  Q.   And how did you find that particular Unit 504?

14  A.   It was marketed on the MLS.  There were many units there.

15  Q.   Did you look at it?

16  A.   I did.

17  Q.   Do you remember about when that was?

18  A.   I want to say October, about October of 2010.

19  Q.   Okay.  And did you make arrangements to see it?

20  A.   I did.

21  Q.   With who?

22  A.   With Mr. Mueller.

23  Q.   And did you go and view the unit at some point?

24  A.   I did.

25  Q.   When was that?

1    A.    Just shortly after contacting him, early November.

2    Q.    And did you go see it?

3    A.    I did.

4    Q.    And what was your impressions when you saw the unit?

5    A.    It was quite nice, very secure.  I did notice that it was

6    in the rear of the building, which a train actually runs right

7    behind the building.  It overlooks train tracks.  But it being

8    on the fifth floor, I felt it was a nice unit, perfectly fine

9    for my intentions.

10   Q.    And did you make a decision about whether or not to

11   purchase it?

12   A.    I did.

13   Q.    And what was the decision?

14   A.    I decided to purchase it.

15   Q.    And did you schedule a closing or did a closing become

16   scheduled?

17   A.    Ultimately, yes.

18   Q.    And when was it scheduled for?

19   A.    There was an initial closing scheduled for, I believe it

20   was right around mid December.

21   Q.    Okay.  And were you represented by an attorney?

22   A.    No.

23   Q.    Okay.  So where was the closing going to be held?

24   A.    At 21 Illinois Street, the offices located there.

25   Q.    Office of what?

1    A.    Of 21 Illinois Street, LLC.

2    Q.    Okay.  And who handled the closing for Mr. Mueller?

3    A.    Christine Carey.

4    Q.    And who is she?

5    A.    She was at that time Mr. Mueller's closing attorney is

6    what he told me, but she also was working with 21 Illinois

7    Street and 5 May Street as well.

8    Q.    Okay.  Did you understand her to have a financial interest

9    in 5 May Street?

10   A.    No.

11   Q.    And the financing, what type of mortgage did you have?

12   A.    It was a private mortgage.  Essentially the owner, the

13   deed-owner mortgages the property themselves.

14   Q.    And in that case that was Mr. Mueller?

15   A.    Correct.

16   Q.    Okay.  And why did you ultimately agree to or decide on

17   going with a private mortgage and not a mortgage company?

18   A.    So that was when I purchased at the height of the collapse

19   of the housing market.  And the building itself at 21 Illinois

20   Street is something called a fractured condo, meaning that

21   there are more developer-owned units than there are homeowner

22   units.  As a result of that, banks had stopped providing

23   mortgages for fractured condos.  Fractured condos all over the

24   country lost what's called their FHA approval, meaning they

25   don't qualify for FHA loans.  And the only way to purchase

 1   those through bank financing would have been through something

 2   called a portfolio loan.  There were very few of those

 3   available in the City of Worcester.  14 to be exact.

 4              MS. DINEEN JERRETT:  Objection.

 5              THE COURT:  Sustained.

 6   Q.   I'm just going to ask you to slow down and listen to the

 7   question and focus on the question and answer that question.

 8        So you ultimately decided on a private mortgage with

 9   Curtis Mueller?

10   A.   Yes.

11   Q.   Okay.  And did you go to the closing?

12   A.   Yes.

13   Q.   And what happened when you went to the closing?

14   A.   It was Ms. Carey and myself, and I was handed a folder and

15   told that it contained --

16              MS. DINEEN JERRETT:  Objection.

17              THE COURT:  Sustained.

18   Q.   Okay.  You went to the closing?

19   A.   Yes.

20   Q.   Who was there?

21   A.   Christine Carey, Mr. Mueller's closing attorney, and

22   myself.

23   Q.   Was Mr. Mueller there?

24   A.   No.

25   Q.   Was Jim Levin there?

1    A.    He was there when I arrived but said hello and left.

2    Q.    Okay.  Did you complete the closing that day?

3    A.    No.

4    Q.    Why?

5    A.    I was handed a folder by Ms. Carey and told it was --

6              MS. DINEEN JERRETT:  Objection.

7              MR. GRIFFIN:  Hold on.

8              THE COURT:  Sustained.

9    Q.    Without telling us what people told you, why did the

10   closing not happen?  And let's take it in steps.

11   A.    I found out there was a tenant in the unit.

12   Q.    How did you find that out?

13   A.    I was handed a folder with my tenant lease and

14   information.

15   Q.    Okay.  Who gave you that folder?

16   A.    Ms. Carey.

17   Q.    And did you know that there was a tenant in the unit?

18   A.    No.

19   Q.    No one had told you that?

20   A.    No.

21   Q.    Did Mr. Mueller explain that to you?

22   A.    No.

23   Q.    It hadn't been explained to you prior to you attending

24   that closing?

25   A.    That's correct.

1   Q.   And that was when again?

2   A.   It was approximately mid December.

3   Q.   And as a result of learning that, what did you do?

4   A.   I didn't close.  I just said, "I can't follow through with

5   the transaction right now until I understand how this

6   happened."

7   Q.   What did you do next?

8   A.   I contacted Mr. Mueller.

9   Q.   And without telling us what he said to you, what did you

10  discuss with Mr. Mueller?

11  A.   How to work out the issue so that I could purchase.

12  Q.   Did you work out the issues with Mr. Mueller?

13  A.   Yes.

14  Q.   And what was the workout?  What was the result?

15  A.   Ultimately that the tenant would be relocated to another

16  unit in the building within 90 days.

17  Q.   Okay.  And did that ever happen?

18  A.   It did not.

19  Q.   Okay.  Prior to that not happening, were you satisfied

20  with that arrangement so much that you were able to make a

21  decision about whether or not to go through with the closing?

22  A.   Yes.

23  Q.   What was your decision?

24  A.   My decision was to go through with the closing.

25  Q.   Okay.  And was the closing rescheduled?

1    A.    Yes.

2    Q.    Do you remember when it was rescheduled for?

3    A.    For the very end of the month after Christmas, the 29th I

4    believe -- 28th.

5    Q.    Did you attend?

6    A.    I did.

7    Q.    And was it held at the same place?

8    A.    Yes.

9    Q.    And was it just you and Ms. Carey again?

10   A.    Yes.

11   Q.    Mr. Mueller wasn't there?

12   A.    No.

13   Q.    And what happened when you got there?

14   A.    Exchanged niceties and I signed the paperwork and provided

15   my payment.

16   Q.    Okay.  Now, you said the tenant never moved; is that

17   right?

18   A.    That's correct.

19   Q.    So what decisions did you make as a result of that?

20   A.    Ultimately I just offered to leave him in the unit.

21   Q.    What became of your daughter and going to college in

22   Worcester and all of that?

23   A.    She never did attend in Worcester.  So she ultimately went

24   out of state.

25   Q.    Okay.  And do you remember about when that became clear to

1  you?

2  A.   That the tenant would not leave?

3  Q.   No, I'm sorry, that your daughter was going to go to a

4  different school.

5  A.   Yes.  It was I believe 2013.

6  Q.   Okay.  So when the tenant never moved -- and were you part

7  of those conversations with the tenant about moving?

8  A.   No, not with the tenant.

9  Q.   Who was engaging in those conversations, if you know?

10       MS. DINEEN JERRETT:  Objection.

11       THE COURT:  Just who was -- overruled.  If you would

12  just answer that question, please.

13  A.   Mr. Mueller.

14  Q.   As far as you know.

15  A.   As far as I know.

16  Q.   Okay.  So what arrangement did you make for the collection

17  of rents, the payment of condo fees and all of that; how was

18  that happening?

19  A.   There was, on-site was 21 Illinois Street, LLC, and I had

20  requested that they also manage my now-rental unit.

21  Q.   Okay.  So how were payments getting to Mr. Mueller?

22  A.   They were to be delivered from the LLC.

23  Q.   And was that your understanding of how this was going to

24  happen?

25  A.   Yes.

1    Q.    Okay.  Now, just staying on this timeline, you mentioned
2    your daughter -- sorry -- that the tenant didn't stay.  Did
3    there come a point where you renewed the lease with the tenant?
4    A.    Yes.
5    Q.    When was that?
6    A.    That was, I believe, November of 2011.
7    Q.    Okay.  And when was that extension -- how long was that
8    extension for, if you recall?
9    A.    I believe it was six months.
10   Q.    Okay.  And in 2012, what happened with your employment in
11   the City of Worcester?
12   A.    I was fired from my position.
13   Q.    Okay.  And did you renew the lease?  Would that have been
14   when you renewed the lease?
15   A.    I did again certainly, yes.
16   Q.    And who collected the rents at this point?
17   A.    I believe I started to collect rents myself after my
18   firing.
19   Q.    And were you able to continue maintaining the condominium
20   when you were no longer employed in the City of Worcester?
21   A.    Eventually not.
22   Q.    So what did you -- and before that, let me just ask you,
23   did you pay out of pocket for any expenses associated with the
24   condominium, 504?
25   A.    I did.

1    Q.   Can you give us an example.

2    A.   I paid all of the taxes for the unit, any special

3    assessments.  Although there were I believe two, they were

4    quite small.  I still was responsible for those.  And any

5    repairs or work that needed to be done I was also responsible

6    for.

7    Q.   Okay.  And at some point did it reach a point where you

8    could no longer sustain this?

9    A.   Yes.

10   Q.   And do you remember about when that was?

11   A.   It was approximately sometime during the summer of '13.

12   Q.   As a result of that, did you make a decision about what to

13   do with this condominium?

14   A.   Yes.

15   Q.   What was the decision?

16   A.   I approached Mr. Mueller about returning the condo via

17   what's called a deed in lieu of foreclosure.

18   Q.   And whose idea was that?

19   A.   That was my idea.

20   Q.   And how did you sort of figure that out?

21   A.   I was aware of that as a result of my work in housing at

22   the City of Worcester.

23   Q.   So did you reach an agreement?

24   A.   Yes.

25   Q.   What was the agreement?

1    A.    Mr. Mueller agreed to accept a deed in lieu, and the lieu

2    is so that I would not have to pay him any difference between

3    an assessment and the amount of the mortgage.

4    Q.    And did you execute that document?

5    A.    Yes.

6    Q.    Did you record it?

7    A.    I did.

8    Q.    So it's a publicly available document?

9    A.    Yes.

10   Q.    And have you seen it during this trial?

11   A.    Yes.

12   Q.    And the mortgage with Mr. Mueller was also a recorded

13   document?

14   A.    Yes.

15   Q.    Okay.  Now, during this trial, you've seen a number of

16   emails between you and Mr. Levin and other individuals; is that

17   right?

18   A.    Yes.

19   Q.    And I'm not going to go through all of them with you, but

20   I do want to bring a few of them to your attention and see if

21   you can explain them to us.  Okay?

22   A.    Mm-hmm.

23         MR. GRIFFIN:  May I see Exhibit 267, please.

24   Q.    Do you recognize this document?

25   A.    I do.

1    Q.   Now, who is it from?

2    A.   It appears -- it's from James Levin.

3    Q.   And is it to you?

4    A.   Yes.

5         MR. GRIFFIN:  Okay.  And could I see Exhibit --

6    (discussion.)  Your Honor, we have an agreement with my sister

7    to introduce Exhibit 550 into evidence.

8         THE COURT:  550?

9         MR. GRIFFIN:  Yes, Your Honor.

10        MS. DINEEN JERRETT:  No objection.

11        THE COURT:  So marked.

12        (Exhibit 550 admitted into evidence.)

13   Q.   Do you see Exhibit 550?

14   A.   Yes.

15   Q.   And is this the same email as Exhibit 267 but it's just a

16   continuation of it?

17   A.   Yes.

18        MR. GRIFFIN:  Can we see them side by side, please.

19   Q.   Showing you Exhibit 550 and Exhibit 267 side by side, are

20   you able to see that?

21   A.   Yes.

22   Q.   Okay.  So 550 is just more complete than 267, fair?

23   A.   Yes.

24        MR. GRIFFIN:  Okay.  Could we just focus on 550,

25   please.

1    Q.    The subject line, can you read that?

2    A.    "Am I removing Curtis Mueller as a contact for the new May

3    Street One-Stop."

4    Q.    And what is your sort of explanation for the subject line?

5    A.    There was what's called a One-Stop application that was

6    going into the State Department of Housing and Community

7    Development.  Upon returning to my office, there was a copy of

8    that available that had been left for me, and on the cover

9    sheet, I noticed that Curtis Mueller's name was still listed.

10   Q.    And what significance did that have for you?

11   A.    He had nothing to do with May Street.

12   Q.    Okay.  And so this inquiry was an attempt to do what?

13   A.    I didn't want to make any changes obviously to anything

14   without speaking to the developer and asking essentially to

15   change the cover sheet.  Is this a mistake; is this an error;

16   like, what is this?

17   Q.    Okay.  And you're suggesting adding Chris Carey?

18   A.    This appears to say that, but it looks like the adding

19   Chris Carey came before the request.

20   Q.    Why do you say that?

21   A.    Because of the time of the email.

22   Q.    And what is it about the time of the email?

23   A.    It appears that I write, "Adding Chris Carey" at 11:00

24   a.m.

25   Q.    Yes.

1    A.   And then Mr. Levin says, "Yes, please," at 11:30, one

2    minute later, "I'm assuming you're the sole principal."  I

3    can't -- that just doesn't make any sense to me.  I wouldn't

4    have asked him if he was the sole principal.  I knew very well

5    by then.

6    Q.   Okay.  But again, you're able to reconcile what you see as

7    some confusion here and tell us that this was an attempt to

8    clarify this One-Stop application?

9    A.   Yes.  The cover sheet for the One-Stop listed Curtis

10   Mueller.

11           MR. GRIFFIN:  Okay.  Let me see Exhibit 257, please.

12   Q.   Can you see Exhibit 257?

13   A.   Yes.

14   Q.   Who sent it?

15   A.   It's sent by me, but in 2010 that was not my email

16   address.

17   Q.   What was your email address?

18   A.   Vachon-jacksonj@ci.Worcester.ma.us.

19           MR. GRIFFIN:  Okay.  Can we see the whole document,

20   please.

21   Q.   Jim Levin's signature block is at the end?

22   A.   Yes.

23   Q.   You see up top where it says "From"?

24   A.   Yes.

25   Q.   Who does that indicate it's from?

 1    A.    From James Levin.

 2    Q.    Okay.  So who put the subject line in there, if you know?

 3    A.    It looks like Mr. Levin.

 4    Q.    And I realize these are confusing, but does it look like

 5    this began with Mr. Levin?

 6    A.    No.

 7    Q.    Okay.  All right.  The text that you write, "Thank you for

 8    the revised AIA.  The budget office has accepted it.  Your

 9    check will be available for pick up," do you remember that

10    text, and can you put it in context?

11    A.    This was in relation to the submission of the first

12    payment request being returned to me for revisions because

13    there was no signature in the architect spot.  And this appears

14    to be myself letting Mr. Levin know that his revision to that

15    was accepted from the budget office.

16    Q.    Okay.  So is that this document that you were testifying

17    about earlier where the architect hadn't signed?

18    A.    Correct.

19          MR. GRIFFIN:  Let me see Exhibit 256.

20    Q.    Can you see Exhibit 256?

21    A.    Yes.

22    Q.    Okay.  Now, take a look at the text of the email.  It

23    talks about "Voucher go round at DHCD regarding clarification,

24    the vouchers having been awarded to 5 May."  What's DHCD?

25    A.    It's the Massachusetts Department of Housing and Community

1    Development.

2    Q.   And what is the reference to the vouchers, if you know?

3    A.   Vouchers are essentially what's called project-based

4    Section 8 vouchers.  They stay with the property rather than

5    move with the tenant.  And they're needed essentially in

6    properties like 5 May Street for the operations of the

7    building.  The building does not operate without them.

8    Q.   And why wouldn't the building operate without Section 8

9    vouchers?

10   A.   Because essentially the funds, NSP funds, most federal

11   funds, what they buy, if you will, is affordability of housing

12   units for a certain period of time depending on the dollar

13   amount.  And in the case of 5 May Street, all of the units

14   were --

15            MS. DINEEN JERRETT:  Objection.

16            THE COURT:  Sustained.

17   Q.   Okay.  Was the obtaining of Section 8 vouchers critical to

18   the 5 May project?

19   A.   Yes.

20   Q.   Okay.  And did you have to go to DHCD to effectuate those

21   vouchers?

22   A.   Yes.

23   Q.   And this email addresses that process, or that intent, I

24   should say?

25   A.   I'm sorry, it just doesn't really make any sense to me.

1    The --

2            MS. DINEEN JERRETT:  Objection.

3            THE COURT:  Sustained.

4    Q.   Okay.  What about the reference to "bad news"?  Do you

5    have a sense of that?

6    A.   Yes.

7    Q.   What are you talking about there?

8    A.   So there was a -- the vouchers are obtained from DHCD.

9    There was a One-Stop submission that went into the state

10   requesting vouchers only, no rehab funding, no additional cash.

11   It was a request for only the tenant-based Section 8 vouchers.

12   Q.   So the One-Stop application does what?

13   A.   The One-Stop application goes to DHCD --

14   Q.   What does it do?  Does it request something?

15   A.   Yes.

16   Q.   Could it request money?

17   A.   Yes.

18   Q.   Could it request vouchers?

19   A.   Yes.

20   Q.   And in this case, this email, the One-Stop application

21   related to vouchers?

22   A.   Correct.

23   Q.   Okay.  And was that application considered or allowed by

24   DHCD, if you know?

25   A.   Ultimately it was not, it was not during this time period.

1   I think there's a header missing.  The timing is not correct.

2   Q.   Okay.  But the subject matter is accurate?

3   A.   Yes, at one point we did submit a One-Stop for vouchers,

4   yes.

5   Q.   And the language at the bottom about a hissy fit, is that

6   your phrase that you used?

7   A.   Yes.

8   Q.   Can you put that into context for us?

9   A.   I was -- this was part of an email I was sending to

10   Mr. Levin essentially telling him about a conversation I had

11   with DHCD where they refused --

12          MS. DINEEN JERRETT:  Objection.

13          THE COURT:  Sustained.

14   Q.   Okay.  You used the term, correct?

15   A.   Yes.  I was --

16   Q.   Hold on.  Yes?

17   A.   Yes.

18   Q.   All right.  And you used it to describe the interaction

19   you had with the people at DHCD --

20   A.   Yes.

21   Q.   -- about this voucher issue?

22   A.   Yes.

23   Q.   Was it an important issue?

24   A.   Yes.

25   Q.   Was it important because it related to the ongoing

1   potential operations of May Street once it was completed?

2   A.   Yes.

3   Q.   And did DHCD have any money in this at this point?

4   A.   Yes.

5   Q.   And is that this reference to the $1.3 million?

6   A.   Correct.

7   Q.   So it was an important issue?

8   A.   Yes.

9   Q.   One that you updated people about?

10   A.   Yes.

11         MR. GRIFFIN:  Okay.  May I see Exhibit 316, please.

12   Q.   Do you remember seeing this email during this trial?

13   A.   Yes.

14   Q.   Okay.  Let's go from the bottom up.  You see Mr. Levin's

15   signature block?

16   A.   I do.

17   Q.   Okay.  Now, what is the email about, do you remember?

18   A.   Yes, it's about, Section 106 is the application to the

19   local historic commission.

20   Q.   Is sort of liaising with the historic commission something

21   you have to do on every project?

22   A.   Yes.

23   Q.   Okay.  Did you do it here?

24   A.   I did.

25   Q.   And that's this letter to -- I'm sorry -- this note to

1    Ms. Flynn?

2    A.   I'm forwarding -- per this email, I'm forwarding a copy of

3    the 106 determination that had already been made.

4    Q.   Okay.  Why are you doing that?

5    A.   It says here --

6    Q.   I'm asking you why you did it, not what it says.

7    A.   Because she asked me for it.

8         MR. GRIFFIN:  Can I see the rest of it.

9    Q.   Now, you've had this exchange with Mr. Levin; is that

10   right?

11   A.   Yes.

12   Q.   Okay.  And can you put that into context, please?

13   A.   I can't.  As part of this thread, it looks like it doesn't

14   belong as part of this thread.

15   Q.   Okay.  And what wage determination would have been

16   pending, if you recall?

17   A.   Davis-Bacon wage determination from the state.

18   Q.   Then we see this response from Mr. Levin, "Whisper."  Does

19   that mean anything to you?

20   A.   No.  And the wage determination --

21        MS. DINEEN JERRETT:  Objection.

22        THE COURT:  Sustained.

23   Q.   Did the word mean anything to you, "Whisper"?

24   A.   No.

25   Q.   And you've heard testimony about an email account

1  attributable to you, "unusualwhisper"?

2  A.   Yes.

3  Q.   Is that an email account that you had?

4  A.   Yes.

5  Q.   And when did you open it?

6  A.   1994.

7  Q.   So how did you or did you pick the words "unusualwhisper"?

8  A.   No.

9  Q.   So how did it come to be your email address?

10 A.   At that time email was brand new, and upon opening an

11 email address, it would essentially give you like three words

12 to choose from, and you pick one, and it would give you three

13 others to pick from, and you pick another one, and that became

14 your email address at hotmail.

15 Q.   Okay.  And was there any followup on your -- let me just

16 ask you, the unusualwhisper, was that your personal email

17 account or one that you used?

18 A.   I used it primarily for spam so as not to fill my inbox.

19 Q.   Did you have any other email addresses?

20 A.   Yes.

21 Q.   Personal ones?

22 A.   Yes.

23 Q.   Was there any followup with Mr. Levin on the

24 unusualwhisper email about whatever issue it is that's being

25 exchanged here?

```
 1   A.   I don't know.  I would imagine not.  I don't know.

 2             MS. DINEEN JERRETT:  Objection.

 3             THE COURT:  Sustained.

 4   Q.   I need you to just -- I know you're nervous.  Just slow

 5   down and listen to the question.

 6        Did you have any further discussion with Mr. Levin on the

 7   unusualwhisper email about this email?

 8             MS. DINEEN JERRETT:  Objection.  Asked and answered.

 9   She said she didn't know.

10             THE COURT:  Overruled.  You may answer.

11   A.   I never had any discussion with Mr. Levin on

12   unusualwhisper.

13             MR. GRIFFIN:  May I see 241, please.

14   Q.   Do you see this email?

15   A.   I do.

16             MR. GRIFFIN:  And may I just see the entire thing.

17   Q.   Can you explain this?

18   A.   I can't.  I have no recollection of anything like this.

19             MR. GRIFFIN:  Can I see Exhibit 317.

20   Q.   Now, this is another email that appears to be to you to

21   someone named Dennis Falcione; is that right?

22   A.   Yes.

23   Q.   And are you able to sort of make sense of this?

24   A.   Not at all.  I don't know any Mr. Falcione, and the

25   subject line, "Grant application package for application
```

1    grant."

2    Q.   And do you see here that it says he'll be using the

3    unusualwhisper address?

4    A.   Yes, I see that.

5    Q.   And is that something that you would have done?

6    A.   Absolutely not.

7         MS. DINEEN JERRETT:  Objection.

8    A.   No, no.

9         MR. GRIFFIN:  May I see Exhibit 311, please.

10   Q.   Do you recognize this email?

11   A.   I have no specific recollection of it.

12   Q.   Okay.  Can you take a look at the content of it?

13        MR. GRIFFIN:  Can we scroll down for

14   Ms. Vachon-Jackson.

15   Q.   What's the NSP1 Update?

16   A.   It's a newsletter that comes out from DHCD.

17   Q.   And what are you doing with it?

18   A.   I forwarded it to Mr. Levin.

19   Q.   Okay.  And why did you forward it to Mr. Levin?

20   A.   There's a request in the update for ongoing and/or

21   completed projects to highlight in the newsletter.

22   Q.   For what purpose, if you know?

23   A.   I guess to emphasize success.  So the government agency

24   who is funding these projects wants to emphasize the success

25   they've had with their funding source.

1   Q.   And that is relevant for the NSP program or for Levin

2   Development?

3   A.   For the NSP program, it ultimately would have benefited

4   everybody.

5        MR. GRIFFIN:  Okay.  Can I see Exhibit 245, please.

6   Q.   This is an email about a construction budget.  Let's go

7   from the bottom.  Is this from you to Mr. Levin?

8   A.   It appears to be so, but again, that was not my email

9   address at that time.

10  Q.   Okay.  Do you remember sending an email about the budget?

11  A.   Yes.

12  Q.   And was it this email?

13  A.   No.  There was no One-Stop budget at that time.

14  Q.   Okay.  What about Exhibit 261, this appears to be an email

15  from you to Julie Jacobson and Dennis Hennessy?

16  A.   I see that.

17  Q.   Okay.  What's the subject?

18  A.   "State NSP."

19       MR. GRIFFIN:  Let's go to the bottom, please.

20  Q.   What are you asking him to do in Exhibit 261?

21  A.   I'm making a recommendation.

22  Q.   About what?

23  A.   About funds that remain uncommitted, specifically state

24  NSP funds that remain uncommitted.

25  Q.   And what are you asking him to do with the uncommitted

1  funds?

2  A.   I'm making a recommendation as to the projects that I

3  believe the funds would be most beneficial for.

4  Q.   Which projects?

5  A.   5 May Street, 161 Austin and 51 Aims Street.

6  Q.   And then did you receive a response?

7       MR. GRIFFIN:  If we could go up, please.

8  A.   Yes.

9  Q.   The initial response is from who?

10 A.   Is from Dennis.

11 Q.   And he appears to be in favor of this idea?

12 A.   Yes.

13 Q.   And did you receive a response from Ms. Jacobson?

14 A.   Yes.

15 Q.   And did you get a hard no from anybody about this

16 suggestion that additional funds be applied to these other

17 projects?

18 A.   No.  The timing, July 1 was prior to the initial grant

19 agreement, so there was not --

20      MS. DINEEN JERRETT:  Objection.

21 A.   No.

22      THE COURT:  Sustained.

23 Q.   I just want you to focus on the question that I'm asking.

24 I understand you have issues with these emails, but I just want

25 to ask you the question.

 1          MS. DINEEN JERRETT:  Objection.

 2          THE COURT:  Let's have a question, please.

 3          MR. GRIFFIN:  Sure.

 4   Q.   So your attempt here was to address uncommitted money to

 5   existing projects rather than start a new project.  Is that the

 6   gist of this?

 7   A.   That's correct.

 8          MR. GRIFFIN:  Now, 308, please.

 9   Q.   Are you able to see this?

10   A.   Yes.

11   Q.   Okay.  Is this asking you to tweak the AIA forms?

12   A.   Yes.

13   Q.   Okay.  And what's the date?

14          MR. GRIFFIN:  Let's go to the bottom, please.  I think

15   you read these from the top down.  Let's go to the top.

16   Q.   What do you mean you'll tweak it to go along with the

17   recent request?

18   A.   It would have been a very small what I'm calling

19   administrative error.  If I asked that at all, that is

20   something that was unimportant to the request.

21   Q.   Do you remember what the administrative error might have

22   been?

23   A.   I don't.

24          MR. GRIFFIN:  Okay.  May I see 238, please.

25   Q.   Can you see this?

1   A.   Yes.

2   Q.   All right.  Who is it from?

3   A.   From Christine Carey.

4   Q.   It's dated in April of 2010?

5   A.   Yes.

6   Q.   What's the subject matter?

7   A.   Notification to me that they want to move --

8        MS. DINEEN JERRETT:  Objection.

9        THE COURT:  Overruled.

10  A.   -- that they want to move forward with closing of the loan

11  documents for 5 May Street.

12  Q.   For 5 May Street.  Let's go down further.  This, "Let the

13  fun begin," what does that mean that you wrote?

14  A.   It's sarcasm.  If you've ever closed a government grant

15  agreement, you'd understand.

16       MR. GRIFFIN:  Okay.  Let's see Exhibit 403.  And I

17  promise we're getting to the end.

18  Q.   Is this an email from you to Ms. Jacobson?

19  A.   Yes.

20  Q.   And what is the subject here?

21  A.   The WRA, Worcester Redevelopment Authority.

22  Q.   What is this idea of a 10 percent return?

23  A.   The Worcester Redevelopment Authority I was recommending

24  as a partner in the 2 Ionic development.  It would have

25  resulted in a fee from the developer to the Worcester

1    Redevelopment Authority that was seeking funding at the time,

2    and the partnership would have provided residual income to the

3    Worcester Redevelopment Authority.

4    Q.   And is 2 Ionic also known as this Boys Club that's

5    referenced here?

6    A.   Yes.

7    Q.   It's the same property?

8    A.   Yes.

9    Q.   And is it ultimately a property that Jim Levin acquired?

10   A.   Yes.

11   Q.   Okay.  And this is the idea that the City would benefit in

12   some way from this?

13   A.   Correct, provide income for Worcester Redevelopment

14   Authority.

15        MR. GRIFFIN:   Okay.  How about Exhibit 429, please.

16   Q.   This is an email from you to Jim Levin, correct?

17   A.   Yes.

18   Q.   And it's referencing assessed values of two properties?

19   A.   Yes.

20   Q.   Okay.  And in one of those is this Boys Club, correct?

21   A.   Yes.

22   Q.   And one is the Caravan lot?

23   A.   Correct.

24   Q.   Is that known by another name?

25   A.   No.  It's always Caravan lot.

1    Q.    Does it have an address?

2    A.    661 Main Street.

3    Q.    Okay.  And what's this reference to the assessed value?

4    Can you put that into context for us?

5    A.    I don't have a specific recollection of sending just an

6    assessed value.  I would need to see the thread here to make

7    sense of it.

8    Q.    Okay.  Assessed values, is that information that is

9    publicly available?

10   A.    Yes.

11   Q.    And do you have any recollection of what the reference is

12   to the parentheses information here?

13   A.    Well, the parentheses are disclosing that the values are

14   sliding.  It's happening all over Worcester.  There's no value

15   to the land.

16         MR. GRIFFIN:  Okay.  Let's see Exhibit 300, please.

17   Q.    This references Eastern Ave.; is this correct?

18   A.    Yes.

19   Q.    Okay.  What was the status of this property, if you

20   remember?

21   A.    Eastern Ave. was in receivership.

22   Q.    And briefly, what does receivership mean?

23   A.    Receivership was a program that was run by the

24   Massachusetts Attorney General's Office, and it court-appointed

25   receivers, those who would be responsible for taking control of

 1  the property for the period of time that they were the

 2  court-appointed receiver.

 3  Q.   So would you have notified only Jim Levin about these

 4  properties?

 5  A.   No.   They went to all AGO certified receivers.

 6  Q.   So other people?

 7  A.   Correct.

 8  Q.   I think that's more than enough emails for now.

 9      Ms. Sutcivni, did you hear this testimony about your being

10  present at the 21 Illinois Street building at add hours?

11  A.   Yes.

12  Q.   Are you able to put that into context or a timeframe for

13  us?

14  A.   Certainly post my separation from the City.   I was having

15  a difficult time finding work, given the negative press.   And

16  Mr. Levin was willing to hire me as a consultant.

17  Q.   And where would you do some work out of?

18  A.   21 Illinois Street.

19  Q.   And would you work odd hours?

20  A.   Yes.

21  Q.   Did you ever have a romantic relationship with Mr. Levin?

22  A.   No.

23  Q.   You've also heard testimony in this case about your

24  speaking with FBI agents in the case.

25  A.   Correct.

1    Q.    And did you do that?

2    A.    Yes.

3    Q.    And do you remember when you might have done that?

4    A.    It was early September, early September 2009.

5    Q.    With regards to the 5 May Street project, was it multiple

6    times you spoke to FBI agents?

7    A.    Oh, yes, for 5 May Street.

8    Q.    Did they come to your house?

9    A.    Yes.

10   Q.    And you understood that you didn't have to speak to them?

11   A.    I did.

12   Q.    And you did speak to them?

13   A.    I did.

14   Q.    And you heard in this courtroom certain things you said to

15   them?

16   A.    I heard them report things that they believe I said to

17   them, yes.

18   Q.    And do you have a different recollection of the things

19   that you said?

20   A.    I do.

21   Q.    Now, at some point we heard testimony that you were a

22   confidential human source for the FBI.

23   A.    I heard that, yes.

24   Q.    And do you have an understanding that you in fact did work

25   in concert with the FBI?

1    A.    No.

2    Q.    What's your understanding?

3    A.    I met with them twice.  They asked me one time to wear a

4    wire to one meeting.

5    Q.    Okay.  And do you know what that was all about?

6    A.    I have an idea.

7    Q.    I don't want you to name names, I don't want anything like

8    that.  But did you have an understanding about what was going

9    on?

10   A.    Yes.

11   Q.    And did it have something to do with the City of

12   Worcester?

13   A.    Yes.

14   Q.    And did you participate in it?

15   A.    In?

16   Q.    The investigation.

17   A.    Yes.

18   Q.    Did you wear a wire?

19   A.    Yes.

20   Q.    And how did it come to be that you were involved with the

21   FBI at that point?

22   A.    A superior requested that I attend a meeting with the FBI.

23   Q.    And do you remember which agent you spoke with?

24   A.    Yes.

25   Q.    Who was it?

1    A.    Al Lamoreaux.

2    Q.    And did it have anything to do with 5 May?

3    A.    No.

4    Q.    Was it prior to 5 May?

5    A.    Yes.

6    Q.    How close in time was it to the 5 May Street project?

7    A.    Within months.

8    Q.    Okay.  And did you have a conversation with Agent

9    Lamoreaux?

10   A.    Yes.

11   Q.    And did you ultimately agree to wear this wire?

12   A.    Yes.

13   Q.    And after that did you have any involvement?

14   A.    A few phone calls I believe.

15   Q.    Okay.  And did you talk about whatever it was that was the

16   subject of the investigation with the various agents?

17   A.    Yes.

18   Q.    Answered their questions?

19   A.    Yes.

20   Q.    You provided them with whatever information that you had?

21   A.    Yes.

22        MR. GRIFFIN:  May I have a moment, Your Honor.

23        I just want to clean up one thing.  If I could see

24   Exhibit 290.  And this is the last email, I promise.

25   Q.    Do you see Exhibit 290?

1    A.    Yes.

2    Q.    And this is you forwarding an email from the

3    unusualwhisper account to your city account?

4    A.    Yes.

5    Q.    Okay.  And was that something that you would do from time

6    to time?

7    A.    I have no recollection doing that.  I suppose if I did

8    somehow receive an email to unusualwhisper, I would have

9    forwarded it to work.

10   Q.    Okay.  And the email address that you have with the City

11   of Worcester, is that the same or different than some of the

12   other email addresses that we've been looking at for you?

13   A.    That is different.  This is the email address that I had

14   when I was employed there.

15   Q.    At the City of Worcester?

16   A.    Yes.

17          MR. GRIFFIN:  I have nothing further.

18          THE COURT:  All right.  Why don't we take the morning

19   break, and we'll see you back here in about 20 minutes.

20          (Jury exits the courtroom.)

21          (Recess, 10:25 a.m. - 10:51 a.m.)

22          MS. DINEEN JERRETT:  May I proceed?

23          THE COURT:  Yes.

24   CROSS-EXAMINATION BY MS. DINEEN JERRETT:

25   Q.    Good morning.

1  A.  Good morning.

2  Q.  So as I understand your testimony from yesterday, you had

3  a lot of experience with lead hazard and lead removal and lead

4  abatement before joining the City of Worcester, right?

5  A.  Yes.

6  Q.  And that's really important work, correct?

7  A.  Yes.

8  Q.  And you took care in that work.

9  A.  I did.

10  Q.  You took a lot of pride in that work.

11  A.  I did.

12  Q.  You were helping people.

13  A.  Yes.

14  Q.  And in some respects, that's similar to joining the CDBG

15  program in a broader sense, correct?

16  A.  Yes.

17  Q.  Those programs are designed to help people.

18  A.  Yes.

19  Q.  There's a focus for low-income housing.

20  A.  Yes.

21  Q.  And that's a good thing.

22  A.  Yes.

23  Q.  And you enjoyed that work.

24  A.  I did.

25  Q.  And you took a lot of pride in that work.

```
 1   A.   Yes.
 2   Q.   You felt proud to be able to be a part of that broader
 3   mission, correct?
 4   A.   Correct.
 5   Q.   You'd agree with me, wouldn't you, that the foreclosure
 6   crisis back in the 2008 timeframe was devastating for housing?
 7   A.   Yes.
 8   Q.   And you'd agree with me that it created an increased need
 9   for affordable housing relief overall in the nation?
10   A.   Yes.
11   Q.   And I think you testified yesterday that in particular in
12   Worcester, this community had been very hard hit by
13   foreclosures; is that right?
14   A.   Yes.
15   Q.   And so there was an especially concerning need for CDBG
16   program funding and specifically the NSP funding in the City of
17   Worcester; is that right?
18   A.   Yes.
19   Q.   And you knew in 2008 when you joined the City of
20   Worcester, you knew about that housing crisis, correct?
21   A.   Not in 2008.
22   Q.   When did you learn about the housing crisis?
23   A.   I would say 2009.
24   Q.   Okay.  So within a year or 18 months of joining the City,
25   you learned about the housing crisis?
```

1   A.   Yes.

2   Q.   When you joined the City of Worcester, however, that was

3   in a lead abatement management context, correct?

4   A.   Correct.

5   Q.   So carrying on that same mission that you had been doing

6   in Somerville for a number of years, correct?

7   A.   Yes.

8   Q.   And I think what you testified to yesterday is that that

9   work in the City of Worcester had not, at least in the recent

10  past before you joined, had not been federally funded; is that

11  right?

12  A.   That was my understanding.

13  Q.   Okay.  And so your understanding was that you were joining

14  the City of Worcester to establish a federal HUD-based lead

15  abatement program in the City?

16  A.   Correct.

17  Q.   And I think you testified that some of what you did was

18  established policies and procedures for that, correct?

19  A.   Correct.

20  Q.   And you knew from your work at the City of Somerville that

21  those policies and procedures were critical to the success of

22  any grant program, correct?

23  A.   Yes.

24  Q.   And they're not only important because HUD requires them,

25  right?  HUD requires policies and procedures to be in place?

1   A.   Yes.

2   Q.   And they're important for that reason to satisfy HUD,

3   correct?

4   A.   Correct.

5   Q.   But they were also important on a daily management issue,

6   correct?

7   A.   Yes.

8   Q.   And so you took your experience in the City of Somerville

9   and brought it to the City of Worcester, correct?

10  A.   Correct.

11  Q.   You talked yesterday about your time in Somerville that

12  generally speaking lead abatement funds were not meant to be

13  advanced; is that fair?

14  A.   In Somerville?

15  Q.   In Somerville.

16  A.   Correct.

17  Q.   And I think you also testified that at times, however,

18  because I think your words were when low-income local workers

19  couldn't afford purchase of materials up front, the City would

20  advance some of that lead abatement funding in the City of

21  Somerville; is that correct?

22  A.   The City would use their own funds to front, and

23  eventually, as the project completed, they would request

24  drawdowns.

25  Q.   So the City was using different funds than the HUD lead

1   abatement funds to advance, is what you're saying?

2   A.    In that case, yes.

3   Q.    Okay.  And I think you said it was part of community

4   development in Somerville; is that right?

5   A.    The lead program was in the community development

6   department, yes.

7   Q.    So the exception that was made you're saying was not with

8   federal funds.  It was with city funds; is that right?

9   A.    I believe they were using tax levy, I believe.

10  Q.    And who made the decision in Somerville to make those

11  exceptions?

12  A.    I'm not sure.  They were there when I got there.

13  Q.    Were you involved in evaluating when an exception was

14  appropriate?

15  A.    Yes.

16  Q.    And was that your decision when you were the head of the

17  lead abatement program in Somerville?

18  A.    Not ultimately.  I would make a recommendation.

19  Q.    And who would you make a recommendation to?

20  A.    The director of housing.

21  Q.    And the director of housing in Somerville relied on your

22  recommendations; is that fair?

23  A.    To some extent, sure.

24  Q.    Well, can you recall instances where the director of

25  housing in Somerville didn't rely on your recommendations?

1    A.    They would ask questions or explore as to why I was making

2    the recommendation.

3    Q.    So they asked you to justify it?

4    A.    Yes.

5    Q.    Okay.  But they would rely on it?

6    A.    Yeah.  It wouldn't -- they wouldn't pull it out of thin

7    air.  The recommendation would come from me, yes.

8    Q.    So I'm not suggesting a thin air.  What I'm asking is, you

9    would make recommendations?

10   A.    Mm-hmm.

11   Q.    You might get questioned about it, asking for backup or

12   asking for your rationale; is that right?

13   A.    Yes.

14   Q.    But ultimately, assuming you could provide that rationale,

15   the head of that department, the head of neighborhood

16   development there would rely on your recommendations?

17   A.    That's fair, sure.

18   Q.    When you started at the City of Worcester -- well, before

19   we go there, I think you said yesterday when you left the City

20   of Somerville you were acting -- or functioning maybe is the

21   better term -- functioning as the housing director for the City

22   of Somerville; is that right?

23   A.    Correct.

24   Q.    And that's because that was not a formal role that you had

25   but your function was that?

1    A.   I don't remember specifically if they ever formalized that

2    promotion.

3    Q.   Okay.  But you do recall working in that capacity?

4    A.   Yes.

5    Q.   Okay.  So you're saying that you're not sure if they

6    formalized that process for you?

7    A.   Correct.

8    Q.   And when you say you're not sure if they formalized it,

9    what do you mean by that?

10   A.   There was essentially functional title and your job

11   duties, and then you're appointed officially to a position

12   within the city budget.  So I don't know if the appointment in

13   the city budget actually came, but I did assume some of those

14   duties when my supervisor at the time, the director of housing,

15   vacated the position.

16   Q.   And were there duties that you didn't assume as part of

17   that position?

18   A.   Yeah, plenty.

19   Q.   So when you left the City of Somerville and applied to the

20   City of Worcester, you submitted a resume, correct?

21   A.   I did.

22   Q.   And in that resume you indicated that you were the

23   director of housing for a certain time period for Somerville;

24   is that right?

25   A.   I don't remember.  I'd have to see it.

1    Q.    Displaying Exhibit 440.

2          THE COURT:  Ms. Sutcivni, can I ask you to try to

3    remember to keep your voice up, please.

4          THE WITNESS:  Yes, sir.

5    Q.   This is a copy of your resume, correct, or one version?

6          THE COURT:  Hold up.  We need screens.

7          MS. DINEEN JERRETT:  My apologies.

8          THE COURT:  Okay.  Can you repeat.

9    Q.   Do you recognize this as a version of your resume?

10   A.   Yes.

11   Q.   I can go to the next page.  Just let me know when you're

12   done.

13   A.   Yes, yes.

14   Q.   And you recognize this third page as the cover letter that

15   you submitted to the City of Worcester in February of 2008; is

16   that right?

17   A.   I don't have specific recollection about submitting this

18   letter, but it does appear that I would write this, yes.

19   Q.   Well, is there anything about this letter that you think

20   is not what it purports to be?

21   A.   No.  It's accurate.

22   Q.   Okay.  Then the first two pages of this is your resume,

23   correct?

24   A.   Yes.

25   Q.   Then at the bottom of the first page, it indicates that

1    for the City of Somerville, Massachusetts, Office of Strategic

2    Planning and Community Development, you were the Housing

3    Programs Director; is that right?

4    A.    Yes.

5    Q.    Okay.  And that was from 2006 to the present, which, based

6    on the cover letter, was February of 2008; is that right?

7    A.    Yes.

8    Q.    And part of what you indicated your responsibilities were

9    as the housing programs director was to coordinate all

10   activities relating to housing programs offered by the City of

11   Somerville, including lead paint abatement and housing

12   rehabilitation programs funded through federal HOME, CDBG and

13   lead hazard control funds.  Did I read that right?

14   A.    Yes.

15   Q.    And then you indicated that you write and revise housing

16   program policies and procedures to ensure effective community

17   programs.

18   A.    Correct.

19   Q.    And it was important, you felt it was important to include

20   this as part of your resume and application to the City of

21   Worcester, correct?

22   A.    It was my resume, it was my duties, yes.

23   Q.    Well, you put your resume together, correct?

24   A.    I actually had this resume written.

25   Q.    Okay.  Did you review it after it was written?

1    A.    I did.

2    Q.    And who wrote it for you?

3    A.    It was a service that I hired online.

4    Q.    And you reviewed it and made sure it was accurate,

5    correct?

6    A.    Yes.

7    Q.    And there's nothing about what I just read that you would

8    disagree was part of your experience then?

9    A.    I didn't have experience with HOME.

10   Q.    Okay.  So the part about federal HOME funds here is

11   inaccurate?

12   A.    Yes.

13   Q.    And you didn't notice that when the service provided you a

14   draft?

15   A.    No, I guess not, unless it was added to a later version

16   somehow.  I obtained that experience later, so I don't know if

17   this was a later version, but at the time of my application I

18   would not have had any experience in HOME.

19   Q.    So your testimony is that at the time of your application

20   in February of 2008 to the City of Worcester, you did not have

21   HOME experience for CDBG programs?

22   A.    HOME is different from CDBG.  It is a separate funding

23   source.

24   Q.    Okay.  My apologies.  You did not have, all capitals, HOME

25   grant experience --

1    A.    Correct.

2    Q.    -- in February of 2008?

3    A.    That's correct.

4    Q.    When did you get the HOME, all capitals, grant experience?

5    A.    Ultimately by insertion into the NSP coordinator position

6    when the housing director for the City of Worcester vacated.

7    Q.    So you never had HOME experience working for the City of

8    Somerville?

9    A.    That's correct.

10   Q.    Okay.  So at no point would that portion of your resume be

11   accurate with respect to the City of Somerville?

12   A.    That's correct.

13   Q.    And the person that you had draft your resume, they

14   received the information from you to draft it, correct?

15   A.    Yes, mostly, yes.

16   Q.    Up at the top of this resume it lists your qualifications;

17   is that right?

18   A.    Yes.

19   Q.    And among those qualifications it indicates ten years of

20   experience mastering state and federal lead paint regulations;

21   is that right?

22   A.    Yes.

23   Q.    Seven years of experience administering federal HUD grants

24   including lead hazard control, lead hazard demonstration and

25   HOME investment partnership funds; is that right?

1    A.    Yes.

2    Q.    And you're saying that that is also inaccurate because of

3    the HOME investment partnership funds?

4    A.    I'm trying to remember.  I believe Somerville may have

5    used HOME funds as part of a housing renovation program.

6    Q.    Well, this says you had seven years of experience with

7    HOME investment partnership funds; is that right?

8    A.    Yes.

9    Q.    Okay.  So how long did you work for the City of

10   Somerville?

11   A.    Seven years.

12   Q.    So in the entire time, according to the qualifications,

13   that you worked for the City of Somerville, you had experience

14   administering, among other things, HOME investment partnership

15   funds?

16   A.    Yes.

17   Q.    And then it says you had "Six years of experience with

18   grant-writing and submission of federal grants with successful

19   awards totaling more than 10 million."  Is that right?

20   A.    Yes.

21   Q.    And finally, under "Qualifications, Six years of

22   experience managing lead paint abatement and residential

23   rehabilitation programs resulting in HUD best practice awards."

24   Is that right?

25   A.    Yes.

1    Q.   If we look at page 2 of your resume, immediately preceding

2    your role as the Housing Programs Director, you were the

3    Housing Programs Manager/Lead Abatement Program Director from

4    2004 to 2006; is that right?

5    A.   I don't believe so.  I think I was the program manager for

6    longer than that.

7    Q.   When do you think you were the program manager for?

8    A.   I was still managing the program when I vacated the

9    position in '08.

10   Q.   Let me expand this a little larger just so you see the

11   entirety of the remainder of your City of Somerville

12   experience.  Is that helpful?

13   A.   Yes.

14   Q.   Okay.  So when we're talking about program manager, were

15   you just referring to the Lead Abatement Program Manager, or

16   were you referring to Housing Programs Manager?

17   A.   No.  The Lead Abatement Program Manager, there was never

18   anybody else in that position, so I maintained that role

19   continuously.

20   Q.   Even when you left in 2008 you were still functioning in

21   that role?

22   A.   Not after leaving, no.

23   Q.   I'm sorry, bad question.  Up to the point you left the

24   City of Somerville, you were --

25   A.   Yes.

1   Q.    -- in other words, the entire time from 2001 until you

2   left in 2008, that entire time you had Lead Abatement Program

3   Manager as part of your responsibilities?

4   A.    Yes.

5   Q.    Okay.  And then in 2004, it looks like the Housing

6   Programs Manager role, you took on that role in addition,

7   correct?

8   A.    Yes.

9   Q.    And the lead abatement program became a director position

10  as opposed to just a manager position?

11  A.    Correct.

12  Q.    Okay.  And then in 2006, as we saw on the first page, you

13  became the Housing Programs Director?

14  A.    Yes.

15  Q.    Okay.  And just so we're clear, when you were the Housing

16  Programs Director, if I understand you correctly, you're saying

17  you also functioned as and served as the Lead Abatement Program

18  Director?

19  A.    I believe that's true.  Honestly I don't have

20  recollection.

21  Q.    Okay.  But you don't have a recollection that anyone else

22  was in the lead abatement program in your function?

23  A.    I don't.

24  Q.    Just with respect to the top entry on the second page,

25  this likewise indicates however that you had HOME-funded

1   rehabilitation and housing services experience, correct?

2   A.   Yes.

3   Q.   At some point --

4        MS. DINEEN JERRETT:  Your Honor, the government would

5   move Exhibit 456 into evidence.

6        MR. GRIFFIN:  No objection, Your Honor.

7        THE COURT:  So moved -- I mean, so marked.

8        (Exhibit 456 admitted into evidence.)

9   Q.   Do you see that on your screen, Exhibit 456?

10  A.   Yes.

11  Q.   And I'm going to be expand the top of that so you do not

12  have to strain your eyes.  This is an email from you to James

13  E. Levin, Esquire; is that right?

14  A.   Yes.

15  Q.   And is this likewise the email address that you testified

16  on direct was not your City of Worcester email address?

17  A.   Ultimately this became my email address when the state

18  transferred to a new server.  So the ci.worcester.ma.us email

19  address is how I started.  I don't know the exact date of the

20  transition to the new server where that changed to

21  worcester.ma.

22  Q.   Well, do you recall in April of 2011 sending your resume

23  to Jim Levin?

24  A.   I don't.

25  Q.   So do you think that this is not accurate to what it

1   purports to be?

2   A.    I don't know.  I just have no recollection of doing that.

3   Q.    The attachment appears to be a resume for you for 2011; is

4   that right?

5   A.    Yes.

6   Q.    So if we look at the next five pages, I'll let you look

7   through it.  You can let me know when to keep going.

8   A.    Yes, yes, yes, yes.

9   Q.    Does that appear to be your resume?

10   A.    It does.

11   Q.    Going back to the first page of the resume, which is page

12   2 of the document, let me expand the top portion.  That's you

13   at the top, correct?

14   A.    Correct.

15   Q.    And in April of 2011, were you living at 262 Dracut Street

16   in Dracut, Massachusetts?

17   A.    Yes.

18   Q.    Under "Qualifications," it indicates, "Ten years of

19   experience in public administration and housing."  Correct?

20   A.    Yes.  The header is incorrect.  That's not -- I never had

21   that email address.

22   Q.    So this is another email address that's incorrect for you?

23   A.    Yes.

24   Q.    You never had jvachon-jackson@hotmail.com?

25   A.    I have no recollection of that at hotmail, no.

1   Q.   No recollection of that email address?

2   A.   None at hotmail.  I had a yahoo, I believe.

3   Q.   Well, you did have a hotmail email address of

4   unusualwhisper.  I think you testified about that on direct,

5   right?

6   A.   Yes.

7   Q.   And so you're saying that you didn't have a hotmail email

8   address of jvachon-jackson@hotmail.com?

9   A.   I just have no recollection of that at all.

10  Q.   Well, it would have been unusual to have a hotmail email

11  address on your resume that wasn't yours.  Would you agree with

12  that?

13  A.   Yes.

14  Q.   And the home phone and the business phone listed there,

15  were those accurate phone numbers in April of 2011?

16  A.   Yes, yes.

17  Q.   So back to the qualifications in April of 2011, is it

18  accurate that at that point you had ten years of experience in

19  public administration and housing?

20  A.   Yes.

21  Q.   And thorough knowledge of state and federal housing

22  regulations?

23  A.   Yes.

24  Q.   Experienced administrator of federal funding sources,

25  including CDBG, HOME and LHC/LHRD?

1    A.    Yes.

2    Q.    And then it talks about the grant-writing experience,

3    which you had a significant amount of, correct?

4    A.    Correct.

5    Q.    Qualified consultant?

6    A.    Yes.

7    Q.    And consummate professional, correct?

8    A.    Yes.

9    Q.    And you were doing some consulting work by April of 2011;

10   is that right?

11   A.    I had done consulting work throughout.  I don't know the

12   date that I finished that work.

13   Q.    Does the bottom part of this page refresh your

14   recollection as to when you were a consultant?

15   A.    Yes.

16   Q.    And it's fair to say that you were a consultant, starting

17   at the bottom, for the Boston Public Health Commission from

18   2004 to 2008, correct?

19   A.    That's what it appears, yes.

20   Q.    Is that accurate?

21   A.    Definitely that I was a consultant for them.  I can't

22   quite pin down the date.

23   Q.    Did you have someone else prepare this resume as well?

24   A.    No.  I would have made changes myself.

25   Q.    Well, let's move on from Boston Public Health Commission

1   and talk just about the cities that you list as being a

2   consultant for.  Are those more familiar to you?

3   A.   Yes.

4   Q.   So the earliest one was the "City of Worcester

5   consultant/grant-writer obtaining a lead hazard control grant."

6   Is that right?

7   A.   Yes.

8   Q.   And in fact, I think you testified yesterday that that was

9   in part the funding that the City received that funded your

10  position ultimately in 2008 with the City; is that right?

11  A.   That's correct.

12  Q.   And then in 2008, it indicates for the City of Malden that

13  you were a consultant/grant-writer and successful HUD/LHRD

14  grant award of one and a half million; is that right?

15  A.   Yes.

16  Q.   Then in 2008 as well, the City of Haverhill, consulting

17  work for CDBG-funded housing rehab; is that right?

18  A.   Yes.

19  Q.   Then in 2009, for the City of Lynn, also with HUD lead

20  hazard control money, correct?

21  A.   Yes.

22  Q.   So I think on direct examination this morning, you

23  indicated that --

24        MS. DINEEN JERRETT:  Let me grab the exhibit number,

25  Your Honor.  My apologies.

1  Q.   Exhibit 317, you were shown this this morning on direct

2  examination, correct?

3  A.   Yes.

4  Q.   I think your testimony was that you didn't recognize the

5  name Dennis Falcione or Falcione?  I'm not sure how you

6  pronounce that.  Is that right?

7  A.   Correct.

8  Q.   Do you recognize Ron Grasso or Andy Scarano?

9  A.   Yes.

10  Q.   So you did work with Malden Redevelopment.  You just don't

11  know who Dennis Falcione is?

12  A.   That's correct.

13  Q.   Do you have any reason to doubt that you sent an email to

14  Dennis Falcione in response to his email to you at the bottom

15  of the page?

16  A.   I think it's the application grant number that's confusing

17  me.  Lead abatement grants all started with MALH.

18          MS. DINEEN JERRETT:  If I can have a moment, Your

19  Honor.

20  Q.   So the issue is that you don't recognize the application

21  grant number?

22  A.   Or the date.  June 11, 2010, I believe that the

23  application I submitted for them was before 2010.

24  Q.   Well, I'm confused because I thought on direct you said

25  you had no idea who Dennis Falcione was.

1    A.    I don't.

2    Q.    Okay.  So the three issues that we have with this email

3    are Dennis Falcione; is that right?

4    A.    Yes.

5    Q.    The date of 2010 in the body of the email from him; is

6    that right?

7    A.    Yes.

8    Q.    And the grant number?

9    A.    Yes.  Also, in the "To" it lists my name twice, but

10   there's no address following them.  And the Dennis Falcione

11   where it says, "Mail to," typically that comes in response.

12   It's not -- that doesn't happen in a direct email.

13   Q.    So are there any other things about this bottom portion of

14   the email besides those four things that you've now identified

15   that are wrong?

16   A.    I can't say.  I don't know Dennis.  I can't say.

17   Q.    Is it fair that your name was Jacklyn but you often went

18   by Jacqui; is that right?

19   A.    Yes.

20   Q.    And this email, would you agree with me, seems to suggest

21   that Dennis knows you because he calls you Jacqui?

22   A.    Yes.

23        MS. DINEEN JERRETT:  Your Honor, I have another

24   exhibit that is not scanned.  It also doesn't have a pretty

25   yellow sticker on it.  So I would propose that we mark it, just

1    so I don't run on to other exhibits, Exhibit 490, and then I

2    would need the display camera.

3                THE COURT:  And no objection?

4                MR. GRIFFIN:  No objection.

5                THE COURT:  All right.  So marked.

6                (Exhibit 490 admitted into evidence.)

7    Q.   Do you see the document that I've just displayed on there?

8    A.   Yes.

9    Q.   And is it fair that this appears to be an email, based

10   upon the top, from Monday, October 18, 2010?

11   A.   Yes.

12   Q.   This is also from Dennis Falcione, correct?

13   A.   Correct.

14   Q.   To you?

15   A.   Yes.

16   Q.   And that's an email address that you definitely recognize

17   as your email address?

18   A.   Yes.

19   Q.   And it says here, "Hi, Jacqui.  Have we received the grant

20   submission confirmation?  Thanks, Dennis."  Did I read that

21   correctly?

22   A.   Yes.

23   Q.   And below that is information about grants.gov funding

24   opportunities, correct?

25   A.   Correct.  He spells my name differently in that email than

1    he did the last.

2    Q.   So are you doubting that this email came to you at the

3    email address that you say was definitely yours?

4    A.   I am.  I have no recognition of this at all.

5    Q.   I'm not asking if you have a recollection of it.  I'm

6    asking if you have any reason to doubt that this email came to

7    you at an email that you definitely recognize as yours?

8    A.   I do doubt it.

9    Q.   So you doubt it because he spells your name incorrectly,

10   that one reason?

11   A.   Yes, and because --

12   Q.   Another reason is you still don't remember Dennis

13   Falcione, correct?

14   A.   Correct.

15   Q.   But he copies Andy Scarano, who you do recognize?

16   A.   Yes, but I was not working for Malden in 2010.

17        MS. DINEEN JERRETT:  Mr. Castles, could I have the --

18   Q.   So I am redisplaying Exhibit 456 and turning to page 2 of

19   your resume.  I'm going to focus starting at three-quarters of

20   the way down for the City of Worcester.  Do you see that, the

21   first entry for the City of Worcester?

22   A.   Yes.

23   Q.   This indicates in June of 2008 you began work as the lead

24   program manager, correct?

25   A.   Correct.

1    Q.    And you held that position until October of 2009?

2    A.    Yes.

3    Q.    Is there anything in this paragraph here that's not

4    accurate?

5    A.    I did not supervise a staff of three.

6    Q.    Then again this is a resume that you drafted, correct?

7    A.    I can't say that for sure.

8    Q.    So you didn't supervise anyone while the lead program

9    manager for the City of Worcester?

10   A.    I supervised one position.

11   Q.    Okay.  So you didn't supervise three, you supervised one?

12   A.    Correct.

13   Q.    So do you think that that was just puffery in your resume?

14   A.    I don't know.

15   Q.    You have no idea where that came from?

16   A.    I don't.

17   Q.    Then in October of 2009, you became the housing director,

18   according to this resume, correct?

19   A.    According to the resume, yes.

20   Q.    But that's not right?

21   A.    That's not right.

22   Q.    Okay.  So do you have any idea how this appears on your

23   resume?

24   A.    I don't.  Ultimately --

25   Q.    It says --

1   A.    -- I was appointed but not in this timeframe.

2   Q.    Okay.  So between October of 2009 and January of 2011,

3   that is not accurate that you were the housing director for the

4   City of Worcester?

5   A.    That's correct.

6   Q.    Is it true that you directed, managed and implemented all

7   housing goals and strategies set forth by the administration,

8   maybe not during those dates but when you were the housing

9   director?

10  A.    Yes.

11  Q.    Okay.  Did you coordinate multiple funding sources and

12  ensure compliance with all local, state and federal rules and

13  regulations?

14  A.    Yes.

15  Q.    And did you enforce local policies to affirmatively

16  further fair housing and administer federal funds to create

17  affordable housing stock?

18  A.    Yes.

19  Q.    Did you manage a staff of six employees?

20  A.    No.  I supervised, but "manage" is a technical term in

21  Worcester.

22  Q.    So you supervised a staff of six employees?

23  A.    Yes.

24  Q.    But you wouldn't say you managed a staff of six employees?

25  A.    That's correct.

1    Q.   With respect to the one staff person while you were the

2    lead program manager, did you supervise that person or did you

3    manage that person?

4    A.   Supervise.

5    Q.   Okay.  So that word is accurate there?

6    A.   Yes.

7    Q.   And then your most recent position listed on the top of

8    page 2 for the City of Worcester was Executive Office of

9    Economic Neighborhood and Workforce Development, Chief of

10   Staff; is that right?

11   A.   Yes.

12   Q.   I'm guessing you're going to tell me that January of 2011

13   is not right?

14   A.   My functional title.  I was appointed.

15   Q.   Okay.  So you'd agree that, functionally, you were the

16   chief of staff in January of 2011?

17   A.   Yes.

18   Q.   And is it true that you directed, managed and implemented

19   all federal and state funding sources for large multidivisional

20   municipal departments?

21   A.   Yes.

22   Q.   Managed staff of approximately 125?

23   A.   No.

24   Q.   Did you supervise staff of 125?

25   A.   No.

1    Q.   Did you manage or supervise any staff?

2    A.   No.

3    Q.   So you have no idea where that came from?

4    A.   No.

5    Q.   You had no one that you supervised --

6    A.   That's correct.

7    Q.   -- as the chief of staff?

8    A.   That's correct.

9    Q.   And no one that you managed as chief of staff?

10   A.   No.

11   Q.   Did you coordinate all funding sources and activities and

12   set policies to ensure and promote the economic strength and

13   vitality of city living?

14   A.   Yes.

15   Q.   So in April of 2011, with respect to this version of your

16   resume, you're saying there are multiple errors on this?

17   A.   Yes.

18   Q.   And today is the first time you're noticing that?

19   A.   You haven't asked me that before.

20   Q.   I'm asking.  Did you notice that before today?

21   A.   I haven't seen this before today.

22   Q.   Okay.  So this is not your resume?

23   A.   I can't say it is.  It has errors.

24   Q.   I want to talk to you, just a couple of more questions on

25   the email address.  So I'm clear, jvachon-jackson@hotmail.com

1   is not your email?

2   A.   I don't believe it is, no.

3        MS. DINEEN JERRETT:  Your Honor, this is three pages

4   that I would offer as Exhibit 491.

5        THE COURT:  So it's one exhibit of three pages that

6   you're offering as 491.

7        MS. DINEEN JERRETT:  Correct.

8        THE COURT:  Any objection?

9        MR. GRIFFIN:  No, Your Honor.

10       THE COURT:  So marked.

11       (Exhibit 491 admitted into evidence.)

12       MS. DINEEN JERRETT:  Mr. Castles, could I have the

13  document camera again.

14  Q.   Do you recognize the name Charles -- I'm sorry -- Chris

15  D'Aveta from the City of Haverhill?

16  A.   Yes.

17  Q.   Is that someone you know?

18  A.   Yes.

19  Q.   I'm showing you the first page of Exhibit 491.  Is that an

20  email from Mr. D'Aveta of October 5, 2010?

21  A.   Yes.

22  Q.   And that's to you at jvachon-jackson@hotmail.com, correct?

23  A.   It is to somebody using my name at

24  jvachon-jackson@hotmail.com, yes.

25  Q.   Okay.  So someone else was using jacklynvachon-jackson?

1   A.   It's not my email address, no.

2   Q.   And it's copied to your City of Worcester email address,

3   correct?

4   A.   It is copied to an email address that did not exist on

5   that date.

6   Q.   Okay.  So neither of these two are you?

7   A.   That's correct.

8   Q.   And page 2 is an email October 18 of 2010 also from Mr.

9   D'Aveta, correct?

10  A.   Yes.

11  Q.   Also to two email addresses that are not you?

12  A.   That's correct.

13  Q.   With the note, "Hi, Jacqui.  Can you forward the completed

14  grant to me so that I may have a look at it before Friday.  I

15  have some time on Tuesday as of now.  Thanks."

16  A.   The --

17  Q.   Did I read that correctly?

18  A.   You read it correctly.

19  Q.   But this is not going to you?

20  A.   The Worcester email, .gov email did not exist in 2010.

21  It's not going to --

22  Q.   My question is, these didn't go to you?

23  A.   No.

24  Q.   But this person did spell Jacqui correctly, correct?

25  A.   Yes.

1    Q.    And page 3 of this document is Friday October 22 of 2010;

2    is that correct?

3    A.    Yes.

4    Q.    And that's also from Mr. DeVita?

5    A.    Yes.

6    Q.    Also to vachon-jacksonj@worcester.ma.gov and

7    jvachon-jackson@hotmail.com.  Did I read those correctly?

8    A.    Correct.

9    Q.    And again, "Hi, Jacqui.  Any luck yet?  What about a

10   contract at grants.gov or even HUD?  I can try calling before

11   the end of the day.  Thanks, Chris."

12   A.    That's what it says, yes.

13   Q.    Do you remember talking to Chris D'Aveta in October of

14   2010 about grants?

15   A.    Not at all.

16   Q.    Didn't happen?

17   A.    I don't remember that at all.  Any conversation I had with

18   him would have been much earlier.

19   Q.    How early?

20   A.    I believe 2008 and 2009.

21   Q.    Are you concerned that while you were working at the City

22   of Worcester you weren't supposed to be doing outside work and

23   that's your concern about answering that these are true and

24   accurate emails of what they purport to be?

25   A.    Not at all.  There is no prohibition from me doing outside

1    work.

2    Q.    Okay.  Do you recognize an email address of

3    jacklynsutcivni@gmail.com?

4    A.    Yes.

5    Q.    That's yours?

6    A.    Yes.

7    Q.    Do you recognize an email address of

8    unusualwhisper@hotmail.com?

9    A.    Yes.

10   Q.    We talked about that one a little bit already, right?

11   A.    Yes.

12   Q.    You don't recognize jvachon-jackson@hotmail.com, that's

13   not you?

14   A.    That's correct.

15   Q.    Do you recognize jvachonjackson@aol.com?

16   A.    No.

17   Q.    Jvachon-jackso  -- no "N" -- number 1, at AOL.com?

18   A.    No.

19   Q.    Jacklynvjackson@yahoo.com:

20   A.    No.

21          MS. DINEEN JERRETT:  Your Honor, the Government would

22   offer Exhibit 492, and Mr. Castles, if I could have the

23   document camera.

24          THE COURT:  Mr. Griffin?

25          MR. GRIFFIN:  Sorry, Your Honor.  No objection.

1          THE COURT:  So marked.

2          (Exhibit 492 admitted into evidence.)

3     Q.   I've just displayed Exhibit 492 on the screen and ask if

4     you recognize this document.

5     A.   It appears to be my resume with the false email address.

6     Q.   And in fact, it appears to be same resume that we saw a

7     few minutes ago, correct, at least based upon the initial

8     information on the top?

9     A.   Yes.

10    Q.   So I'm displaying both Exhibits 492 and 456 starting at

11    page 2.  You'd agree with me, wouldn't you, that your name,

12    address, home phone, business phone, and email address that are

13    listed there are the same?

14    A.   They are the same, yes.

15    Q.   And would you agree that the qualifications are the same?

16    A.   No.

17    Q.   What are the differences in the qualifications?

18    A.   Number 492 says eight years of experience, and the other

19    says ten years.

20    Q.   And is it fair to say that, other than that, they are the

21    same?  Actually, there does appear to be another date in the

22    third -- fourth bullet point, that's different; is that right?

23    A.   I'm sorry, can you repeat the question.

24    Q.   In the fourth bullet point on Exhibit 492, it indicates

25    that you have been an accomplished grant-writer since 2003,

1   correct?

2   A.   Correct.

3   Q.   And in 491 -- I apologize.  It is the same.  At the

4   bottom, under "Experience," it also shows your work as a

5   consultant, correct?

6   A.   Correct.

7   Q.   And it appears that the City of Lynn is new information on

8   Exhibit 456, correct?

9   A.   Correct.

10  Q.   Okay.  But otherwise it does list the City of Haverhill?

11  A.   Yes.

12  Q.   And the City of Malden?

13  A.   Yes.

14  Q.   And City of Worcester?

15  A.   Yes.

16  Q.   As well as the Boston Public Health Commission?

17  A.   That's correct.

18  Q.   And with respect to Exhibit 492, it indicates at the top

19  HUD Lead Hazard Control Grant Program Application 2011 City of

20  Worcester Mass.; is that right?

21  A.   That's correct.

22  Q.   And 492 is a three-page resume; is that right?

23  A.   Yes.

24  Q.   You'd agree with me, wouldn't you, that the HUD

25  regulations are voluminous?

```
1    A.    Yes.

2    Q.    There's a lot of requirements in those regulations?

3    A.    Yes.

4    Q.    And someone needs to go through those regulations in order

5    to understand them, correct?

6    A.    Correct.

7    Q.    And is that something that you did in the course of your

8    professional life?

9    A.    Yes.

10   Q.    Including with the City of Worcester?

11   A.    Yes.

12   Q.    And I think you said that one of your job assignments at

13   the City of Worcester was in fact to draft policies for one of

14   the HUD programs; is that right?

15   A.    Yes.

16   Q.    And that was NSP?

17   A.    Worcester Lead Abatement Program.

18   Q.    Well, you were also tasked with drafting policies for the

19   City on NSP, correct?

20   A.    Ultimately, yes.

21   Q.    Okay.  So for the City of Worcester, there were two

22   separate federally funded programs that you were responsible

23   for drafting policies on?

24   A.    I would say one, and for NSP I was asked to participate

25   with a group in order to do that.
```

1    Q.    So for the lead it was only you?

2    A.    Yes.

3    Q.    But for NSP it was you and others?

4    A.    Yes.

5    Q.    And specifically what portion were you asked to draft for

6    the City for NSP?

7    A.    Nothing actually to draft.  It was review.  We had hired

8    -- City of Worcester had hired consultants to draft that

9    manual.

10   Q.    And so you had to review it and approve it?

11   A.    No.  Review and make comment and corrections where I

12   thought they should be.

13   Q.    And did you do that?

14   A.    I did.

15   Q.    When you became the NSP coordinator, I think you said that

16   was in September of 2009; is that right?

17   A.    Yes.

18   Q.    And I believe your testimony yesterday was that as part of

19   being the NSP coordinator, one of the things that you were

20   concerned about was the timeline ticking for obligating NSP

21   funds; is that right?

22   A.    Yes.

23   Q.    And your testimony yesterday was that those obligation

24   deadlines were December of 2009; is that right?

25   A.    Yes.

1    Q.    And you only had three months?

2    A.    I believe that's correct.

3    Q.    Isn't it true that the obligation deadlines for NSP1 were

4    September of 2010, a year after you became the NSP coordinator?

5    A.    I don't know.  I would have to see the regulation.

6    Q.    I'm displaying first Exhibit 454.  Do you see that

7    document on the screen?

8    A.    I do.

9    Q.    And this is an email June 29 of 2010, correct?

10   A.    Yes.

11   Q.    From someone at HUD?

12   A.    Yes.

13   Q.    And it indicates, it's a reminder, "NSP1 obligation

14   pipeline due June 30, 2010."  Do you see that?

15   A.    I see that.

16   Q.    And your email is -- one of the emails is to you in the

17   third section, correct?  Do you see the third line down?

18   A.    It is to a worcester.ma.gov address, which was not my

19   email address at that time.

20   Q.    Okay.  Well, it's also to Dennis Hennessy at a

21   worcester.ma.gov email address; is that right?

22   A.    Yes.

23   Q.    So in addition to yours being wrong, somebody had the

24   foresight to pick one that your email address ultimately

25   became?

1  A.   The worcester.ma.gov addresses did not exist at that time.

2  Q.   That wasn't my question.  My question is did Daniel Rogers

3  at HUD have the foresight --

4         MR. GRIFFIN:  Objection.

5  Q.   -- to figure out --

6         THE COURT:  Hold up.  Let's hear the question.  Please

7  don't make it argumentative.

8  Q.   The vachon-jacksonj@worcester.ma.gov email, you would

9  agree with me that that is what's listed here, correct?

10 A.   Correct.

11 Q.   Would you also agree with me that for Dennis Hennessy --

12 who I think you testified was your supervisor at the time,

13 correct?

14 A.   Correct.

15 Q.   That his email is listed there as

16 hennessyd@worcester.ma.gov; is that right?

17 A.   Yes.

18 Q.   And the subject line is, "Reminder, NSP1 obligation

19 pipeline due June 30, 2010."  Is that correct?

20 A.   That is what this snapshot says.

21        THE COURT:  Ms. Dineen Jerrett, is 454 in?

22        MS. DINEEN JERRETT:  I apologize, Your Honor.  I would

23 offer 454.  Your Honor, I offer 454, followed by 456.

24        THE COURT:  456 is in, Mr. Castles tell us.

25        MS. DINEEN JERRETT:  Sorry.  455, I'm blind.  454 and

1   455.

2            THE COURT:  And Mr. Griffin?

3            MR. GRIFFIN:  No, Your Honor.

4            THE COURT:  Don't ask me how Marty keeps track of all

5   of this.  They're so marked.

6            (Exhibits 454, 455 admitted into evidence.)

7            MS. DINEEN JERRETT:  My apologies for that, Your

8   Honor.

9   Q.   So I'm redisplaying 454 and ask, for the bottom portion of

10  the email, the body of the email, does it indicate above the

11  chart that's there, "As a reminder, the NSP1 obligation

12  deadline for each grantee is as follows."  And it lists a

13  number of cities and an NSP1 obligation deadline.  Do you see

14  that?

15  A.   Yes.

16  Q.   And do you see that Massachusetts is listed there?

17  A.   I do.

18  Q.   And also Worcester is listed there?

19  A.   Yes.

20  Q.   And is it accurate to say that those are listed as

21  September 9 of 2010 obligation deadline dates?

22  A.   That is what is written here.

23  Q.   Does that refresh your recollection as to the obligation

24  deadline date for NSP1?

25  A.   I believe there were two distinct dates.  One was an

1    obligation date.  The other was I believe what they call like a

2    loan closing date, if you will.

3    Q.   Okay.  And this says "Obligation deadline," correct?

4    A.   Yes.

5    Q.   Do you agree with me that the obligation deadline for

6    Worcester was September 9 of 2010?

7    A.   There was a -- I would need to refer to the regulation,

8    but there was a date before that by which funds needed to be

9    somehow committed.

10   Q.   I'm displaying Exhibit 455.  This is an email dated August

11   4 of 2010; is that right?

12   A.   Yes.

13   Q.   And this is from Allison Haight.  She was with DHCD,

14   correct?

15   A.   That's correct.

16   Q.   And this is also an email to you at the

17   vachon-jacksonj@worcester.ma.gov email address?

18   A.   Yes.

19   Q.   And this says, "Hi, Jacqui.  Sorry to have missed you this

20   afternoon.  Congrats on almost achieving 100 percent obligation

21   for all NSP funds, state and federal.  Below is a list of items

22   needing clarification and followup in some cases.  Please send

23   a response by August 20."  Did I read that correctly?

24   A.   Yes.

25   Q.   And at that point with respect to August 4, it indicates

1    you were almost 100 percent obligated for NSP; is that right?

2    A.    That's correct.

3    Q.    You indicated in your direct testimony that this NSP

4    coordinator position was not only new to you but also new to

5    the City because NSP was new; is that right?

6    A.    Yes.

7    Q.    And you were up for the challenge; is that true?

8    A.    Yes.

9    Q.    Were you excited about it?

10   A.    Not so much.

11   Q.    Well, you were excited about the goal of the program,

12   correct?

13   A.    Yes.

14   Q.    That was consistent with your personal mission of being

15   involved in these types of programs to help with affordable

16   housing, correct?

17   A.    Yes.

18   Q.    And it's fair to say you didn't have experience with NSP,

19   but no one else did either; is that right?

20   A.    That's correct.

21   Q.    Okay.  But you did have some experience from CDBG

22   programs, correct?

23   A.    Yes.

24   Q.    And is it fair to say that there was some similarities

25   between CDBG programs and the NSP program?

1  A.   More than some.  NSP was CDBG.

2  Q.   So a lot of similarities?

3  A.   Yes.

4  Q.   So even though NSP itself was new, the subject matter and

5  the CDBG program was not new to you?

6  A.   That's correct.

7  Q.   I think you testified yesterday that when you became the

8  NSP coordinator that you continued to be the lead abatement

9  program manager; is that right?

10  A.   Yes.

11  Q.   That you observed both positions?

12  A.   Yes.

13  Q.   Is that because there was no one else to do the lead

14  abatement work?

15  A.   That's correct.

16  Q.   But no one forced you to take on both roles, correct?

17  A.   By virtue of the promotion, I understood that I would be

18  doing both roles until such time as a new lead abatement

19  coordinator is hired.

20  Q.   But as you just described it, it was a promotion, correct?

21  A.   It was a promotion.

22  Q.   It wasn't a punishment of some sort to have you be the NSP

23  coordinator?

24  A.   My opinion at that time or now?

25  Q.   It was something that was to presumably reward you for

1    work that you had been doing with the City of Worcester, right?

2    A.    Yes.

3    Q.    That's generally how people get promoted, correct?

4    A.    Correct.

5              THE COURT:  Why don't we take our second break.

6              (Jury exits the courtroom.)

7              (Recess, 11:57 a.m. - 12:12 p.m.)

8              (Jury enters the courtroom.)

9              MS. DINEEN JERRETT:  Thank you, Your Honor.

10   Q.    I believe you testified on direct examination about the

11   system for drawing down funds from the federal government for

12   the City.  Do you remember talking about that?

13   A.    Somewhat.

14   Q.    You're familiar with how the funds were drawn down,

15   correct?

16   A.    Please define your definition of "drawn down."

17   Q.    Well, let me back up.  Are you familiar with the DRGR

18   system?

19   A.    Yes.

20   Q.    And the DRGR system is for the state NSP funds, correct?

21   A.    No.

22   Q.    What was the DRGR system for?

23   A.    The DRGR was utilized for the federal NSP both quarterly

24   reporting and drawdown.  It has other uses as well.

25   Q.    Okay.  But with respect to the NSP, you're saying it was

1   for --

2   A.   Federal.

3   Q.   -- federal NSP.  Okay.  You had a login for the DRGR

4   system, correct?

5   A.   Yes.

6   Q.   And you made entries into that system, correct?

7   A.   Yes.

8   Q.   Okay.  And that was a system that could be accessed by the

9   state to check in on progress of projects, correct?

10  A.   By the federal government, not the state.

11  Q.   I'm sorry.  I misspoke.  By the federal government to

12  check in on the status, correct?

13  A.   Correct.

14       MS. DINEEN JERRETT:  Okay.  And Mr. Castles, if I

15  could have the computer.

16  Q.   I'm displaying what's been marked as Exhibit 143.  This is

17  not for DRGR.  This is IntelliGrants, correct?

18  A.   Yes.

19  Q.   And IntelliGrants was what I was thinking with respect to

20  the state NSP; is that right?

21  A.   That's correct.

22  Q.   Okay.  And you had similarly a login for the IntelliGrants

23  system, correct?

24  A.   Yes.

25  Q.   And you would input information into that system?

1    A.    Yes.

2    Q.    And you tried to be accurate in that system, correct?

3    A.    Yes.

4    Q.    Because it was important to be accurate?

5    A.    Correct.

6    Q.    The state was relying on representations made in this

7    program, correct?

8    A.    Yes.

9    Q.    And the screen that's -- the page that's displayed here,

10   this says it's "NSP program grant menu - related items."  Do

11   you see that?

12   A.    I do.

13   Q.    And is it fair to say that there were multiple screens for

14   the IntelliGrants system?

15   A.    Yes.

16   Q.    And was this familiar to you, this "grant menu - related

17   items"?

18   A.    No.

19   Q.    You've never seen this?

20   A.    That's correct.

21   Q.    Do you see on the bottom portion it indicates, "Document

22   Type, Name, Current Status, Period Due" -- or sorry, "Period

23   Date/Date Due, Created By, Last Modified By"?

24   A.    I do.

25   Q.    Okay.  And you see your name under some of these entries

1    for "Created By."  Is that right?

2    A.    Yes.

3    Q.    And it also gives the date and time of the "Created By"

4    entry; is that right?

5    A.    Yes, that's what's listed here, yes.

6    Q.    So with respect to page 1, these entries for "Name, Date,

7    CL," which appears to be claim, correct?

8    A.    Yes.

9    Q.    And then "-Worcester-" and then a number, correct?

10   A.    Correct.

11   Q.    And then the status, the "Current Status" column, which

12   I'll expand so you can see that that's what it says, is the

13   status either "Claim Paid" or "Claim Canceled."  Do you see

14   that?

15   A.    That's what it says, yes.

16   Q.    Okay.  So I'm going to focus you first on page 12 but then

17   I'm going to go back to page 1 so we can tie this entry, okay.

18        Page 12, do you see at the top there's

19   "QPR-2008-3-Worcester-00056"?

20   A.    Yes.

21   Q.    Okay.  So if we turn back to page 1, there is an entry

22   "Corresponding to" on page 2.  Do you see that there it talks

23   about reports being submitted, correct?

24   A.    Correct.

25   Q.    Okay.  And next to the report for the entry for 00056,

1    which is six from the bottom, do you see that?

2    A.    Yes.

3    Q.    Okay.  It says next to that, to the left of that it says

4    that it's a progress report?

5    A.    Yes.

6    Q.    And to the right of that it says "Report Approved,"

7    correct?

8    A.    Correct.

9    Q.    And the period is January 1, 2010 through March 31 of

10   2010; is that right?

11   A.    That's correct.

12   Q.    And then next to that it indicates -- let me expand the

13   top so you can see the top column.  From the page before,

14   "Created By" column, that lists you, correct?

15   A.    Yes.

16   Q.    So then if we go back to page 12, you'd agree with me,

17   wouldn't you, that this corresponds to that entry?

18   A.    I would not agree with that.

19   Q.    Do you see at the bottom of the narrative that's typed

20   under "All administrative and management issues."  Do you see

21   that paragraph that I just expanded?

22   A.    I see it.

23   Q.    Okay.  And do you see that the second-to-last sentence

24   talks about, "The grant is on schedule to encumber all funds by

25   September 2010."  Is that right?

1    A.    I see that, yes.

2    Q.    And you would agree with me that on page 2, the entry for

3    00056 indicates that you created that April 15 of 2010?

4    A.    It indicates that I created a quarterly progress report.

5    That exhibit you showed me is not part of the interface.

6    Q.    So if you click on the hyperlinks that are here, what does

7    it show you?

8    A.    I've never seen this, actually.  I don't know.

9    Q.    So you're saying that the document on page 12 is not what

10   you click on and get the hyperlink?

11          MR. GRIFFIN:  Objection.

12   A.    I don't --

13          THE COURT:  Sustained.

14   A.    I've never seen this.  This is not part of the quarterly

15   reporting for IntelliGrants.

16   Q.    Okay.  Is it fair to say that with respect to the NSP

17   program that there were, I think you testified on direct that

18   there were lots of potential projects, correct?

19   A.    Correct.

20   Q.    There were the areas that have been identified throughout

21   the City as potentially being eligible for this funding?

22   A.    Yes.

23   Q.    And there was less funding than available for all the

24   projects, correct?  Not every project could get funded, or not

25   every potential project could get funded, correct?

1   A.    Every -- no, not every eligible property, certainly, in

2   the census tracts could be funded.

3   Q.    Okay.  So not every eligible property in the census tract

4   could get funded?

5   A.    That's correct.

6   Q.    Okay.  And is it also fair to say that there was a

7   waitlist for projects?

8   A.    Not for NSP, no.

9   Q.    Not for NSP?

10  A.    That's correct.

11  Q.    Okay.  Showing you the same page 12 of Exhibit 143, am I

12  reading the highlighted portion correctly saying, "The program

13  currently has a waiting list for projects under NSP.  The

14  waitlist contains approximately 12 units that are eligible

15  under the program but for which no funds are currently

16  available.  Should any of the existing projects fall through

17  for any reason, a waitlist of properties is available to ensure

18  swift expenditure of any remaining balance."  Did I read that

19  correctly?

20  A.    That's what it says.

21  Q.    But you disagree with that?

22  A.    I don't know who wrote it or what it is.

23  Q.    Do you disagree that there was a waiting list for NSP?

24  A.    I do.

25  Q.    Okay.  In January of 2011, when you became the chief of

1    staff, that was a significant promotion, correct?

2    A.    Not in January.  It was title only in January.

3    Q.    It was a significant promotion to get to chief of staff,

4    correct?

5    A.    Actually not.

6    Q.    That was a demotion?

7    A.    I lost any kind of supervisory role I had had in that

8    position.

9    Q.    Well, you became executive management at that point,

10   correct?

11   A.    No.  July.

12   Q.    When you became chief of staff -- I understand you want to

13   argue about whether it was July or January of 2011.

14          MR. GRIFFIN:  Objection.

15          THE COURT:  Sustained.

16   Q.    When you became chief of staff, was that a promotion to an

17   EM-level position?

18   A.    Yes, yes.  I'm sorry, I misunderstood your question.

19   Q.    And I know we asked about this already, but your resume

20   indicated you managed or supervised 125 people, you said that

21   was not true?

22   A.    Correct.  I don't believe that was my resume.

23   Q.    Okay.  During your time at the City of Worcester, you did

24   manage in certain capacities, correct?

25   A.    I did not formally manage in that position, no.

1   Q.   I'm asking for any position in the City of Worcester.

2   A.   I did not.

3   Q.   You did not manage anybody?

4   A.   No.

5   Q.   You didn't -- did you supervise?

6   A.   Yes.

7   Q.   Okay.  So within certain positions in the City of

8   Worcester, you supervised people, correct?

9   A.   Correct.

10  Q.   And when you supervised people, part of that supervision

11  means you're not doing their day-to-day work, but you're

12  supervising their day-to-day work, correct?

13  A.   Yes.

14  Q.   And also is it fair to say that that means you're not

15  doing that work that they are doing on a day-to-day basis?

16  A.   Not in Worcester.

17  Q.   Well, you relied on people to do their jobs, correct?

18  A.   When I could.

19  Q.   And you were relied upon to do your job, correct?

20  A.   As well as many others, yes.

21  Q.   Okay.  And when you rely on people, there's a certain

22  element of trust involved in that, correct?

23  A.   Yes.

24  Q.   When you were the -- whether it was January or July, when

25  you were functioning as the chief of staff, okay -- do you

1   understand what I'm asking, when you were functioning as the

2   chief of staff?

3   A.   Yes.

4   Q.   Would you have also -- would that have been known as any

5   other position?

6   A.   No.

7   Q.   Okay.  Would that have been the equivalent of an assistant

8   city manager?

9   A.   No.

10  Q.   Was there in fact an assistant city manager?

11  A.   That position vacated.

12  Q.   So it was a vacant position or it was eliminated?

13  A.   It was eliminated.

14       MR. GRIFFIN:  Could we have the timeframe, Your Honor,

15  timeframe on that.

16       MS. DINEEN JERRETT:  While she was chief of staff.

17  A.   Oh, then it would have been vacant actually.

18  Q.   Okay.  So it still existed as a position, but it was not

19  occupied by any individual person?

20  A.   It is my understanding that that position was essentially

21  divided amongst myself and Mr. Timothy McGourthy.

22  Q.   Okay.  So that's what I'm trying to figure out.  Are you

23  saying functionally you took on some of the role as assistant

24  city manager?

25  A.   Yes.

1    Q.    But in title, it was not called assistant city manager?

2    A.    That's correct.

3    Q.    Okay.  When did you start functionally taking on the role

4    that would have constituted assistant city manager?

5    A.    I never did assume that role.  Mr. McGourthy assumed that

6    role.

7    Q.    Maybe it was not a great question.  You functionally took

8    on some of the aspects of assistant city manager as chief of

9    staff; is that right?

10   A.    Yes.

11   Q.    When did that happen?

12   A.    January.

13   Q.    Of 2011?

14   A.    Yes.

15   Q.    Okay.  When you began to function as the chief of staff in

16   January of 2011, did that title position exist before then?

17   A.    No.

18   Q.    So is it fair to say that in January of 2011, a new title

19   was created that you ultimately assumed the role of, correct?

20   A.    No.

21   Q.    Okay.  Was there a chief of staff -- your title was chief

22   of staff of economic development, correct?

23   A.    That was my functional title, yes.

24   Q.    And ultimately it became your title, correct?

25   A.    Yes, ultimately it became a position.

1    Q.    Okay.  Prior to you taking that as a functioning position

2    in January of 2011, did that position exist in that form with

3    that title?

4    A.    Not with that title, no.

5    Q.    Okay.  So who functionally did that job before you?

6    A.    Timothy McGourthy.

7    Q.    And what was his title when he did it?

8    A.    Director of economic development.

9    Q.    Okay.  And prior to Timothy McGourthy being the director

10   of economic development, that was a role that had been at least

11   at one point held by Dennis Hennessy, correct?

12   A.    No.

13   Q.    Who held that role before Timothy McGourthy?

14   A.    I don't know.

15   Q.    Was that a new role for Timothy McGourthy?

16   A.    Timothy McGourthy was the director of economic development

17   and ultimately moved into the position of the assistant city

18   manager with a different functional title.

19   Q.    Okay.  So when Mr. McGourthy moved into the position of

20   assistant city manager with a different functional title, what

21   was the title of that position?

22   A.    Chief development officer.

23   Q.    Okay.  So would you say that you and Timothy McGourthy

24   were peers, or was one in a supervisory capacity?

25   A.    Mr. McGourthy supervised me.

1    Q.    He supervised you?

2    A.    Yes.

3    Q.    Okay.  Is it also fair to say that when those -- and both

4    the position that Mr. McGourthy took and your chief of staff

5    position, the titles of those positions were new in 2011?

6    A.    That's correct.

7    Q.    The work, however, functionally for both positions was at

8    least in part some of the work of the former titled position

9    assistant city manager?

10   A.    Some of it, yes.

11   Q.    Okay.  Was there anyone besides you and Mr. McGourthy who

12   took on the duties of the position that had been known as

13   assistant city manager?

14   A.    I'm unsure if the city manager gave any other duties to

15   anyone else.

16   Q.    Okay.  But as far as you know, you know -- that was a

17   horrible question.  You know you took on some of those roles,

18   correct?

19   A.    Yes.

20   Q.    And you know that Timothy McGourthy took on some of those

21   roles?

22   A.    Yes.

23   Q.    But at no time was your title assistant city manager,

24   correct?

25   A.    That's correct.

1  Q.   And that's true for any of your time at the City of

2  Worcester, correct?

3  A.   That's correct.

4        MS. DINEEN JERRETT:  Okay.  Your Honor, the Government

5  would introduce Exhibit 167.  I've spoken with Attorney

6  Griffin.  I will retrieve for him a Bates-numbered version of

7  this document.  It doesn't have a Bates stamp on it now, but I

8  will retrieve that for him.

9        THE COURT:  Aside from that, Attorney Griffin, any

10 objection?

11       MR. GRIFFIN:  No, Your Honor.

12       THE COURT:  It is marked.

13       (Exhibit 167 admitted into evidence.)

14 Q.   I've displayed Exhibit 167 on the screen.  Do you see this

15 document?

16 A.   Yes.

17 Q.   And it appears that -- and it's an email from James E.

18 Levin, Esquire, Monday January 24, 2011 to you, correct?

19 A.   I'm not sure.  It seems to have a David Moore header.

20 Q.   What I'm asking is, is the "From" line from "James E.

21 Levin, Esquire"?

22 A.   Yes.

23 Q.   "Sent:  Monday January 24, 2011."

24 A.   Yes.

25 Q.   "To:  Vachon-Jackson, Jacklyn."

1    A.    That's what it says.

2    Q.    "Subject:  Boys Club questions re: EPA."

3    A.    Yes.

4    Q.    And it indicates that there's an attachment, correct?

5    A.    Correct.

6    Q.    And if you look at page 2 of this document, it's the same

7    January 24, 2011, correct?

8    A.    Yes.

9    Q.    And this one says the attachment is BC.doc, correct?

10   A.    Yes.

11   Q.    Going back to the first page, the body of this email,

12   would you agree with me that the footer or the signature

13   appears to be from James E. Levin, correct?

14   A.    That is his name, yes.

15   Q.    That's also his address as you knew it from his office in

16   Holliston; is that true?

17   A.    Not in 2011.  I believe he changed his address at some

18   point.

19   Q.    Is the 23 Water Street, Holliston, Massachusetts 01746, is

20   that an address you have known for James E. Levin?

21   A.    Yes.

22   Q.    And this email says, "Read, massage, add, and subtract and

23   put on COW stationery."  Did I read that first line correct?

24   A.    Yes.

25   Q.    And "COW," do you understand that to mean City of

1   Worcester?

2   A.   Yes.

3   Q.   "This is both confirmation of the title and letter of

4   recommendation in one paragraph or less.  I'd tell him you

5   expect that you will stay longer and have a different letter

6   crafted by the time you both leave together but this is

7   downside protection.  Lastly, lead title DD is not really what

8   you do."  Did I read that correctly?

9   A.   Yes.

10          MS. DINEEN JERRETT:  Then if we go to the third page

11   of the document, I will represent to the Court that the

12   metadata for this indicates it is the BC.doc that I can show

13   Mr. Griffin.

14   Q.   And this says, "To whom it may concern.  FM, Michael

15   O'Brien, City Manager, City of Worcester, Mass., Re: Jacqueline

16   Vachon-Jackson, Assistant City Manager, City of Worcester, MA."

17   Did I read the top of that properly?

18   A.   Yes.

19   Q.   And then there's a date with a blank, and then it says,

20   "Please let this memorandum serve as my confirmation that

21   Jacqui has served the City of Worcester in the capacity of

22   Assistant City manager for the prior 12 months.  During that

23   period, Jacqui has not only fulfilled all of the duties

24   inherent in the position but also exceeded my expectations with

25   her tenacity, intelligence, leadership and management skills."

1    Did I read that correctly?

2    A.   Yes.

3    Q.   And then there's a paragraph, "Prior to holding the

4    Assistant City Manager's position, Jacqui held the position of

5    DD Down's Syndrome, and before that Director of Housing

6    Community Development."  Did I read that correctly?

7    A.   That's what it says.

8    Q.   "Her ascension to this latest position to with the City of

9    Worcester is testament to her abilities.  If you have any

10   questions about Jacqui, I would welcome an opportunity to

11   discuss them with you."  Did I read that correctly?

12   A.   That is what it says.

13   Q.   And this appears, based upon the front of the email, to be

14   something that Jim Levin sent to you indicating, "Read,

15   massage, add, subtract and put on COW stationery."

16   A.   That's what this says.

17   Q.   In your job throughout your time at the City of Worcester,

18   it was important to you to be viewed positively, correct?

19   A.   Yes.

20   Q.   You wanted your peers to view you positively?

21   A.   Yes.

22   Q.   You wanted your supervisors to view you positively?

23   A.   Yes.

24   Q.   And you wanted people that reported to you or that you

25   supervised or managed to view you positively, correct?

1    A.    Well, I didn't manage anyone, and no one reported to me.

2    Q.    Okay.  So people that you supervised, it was important

3    that they viewed you positively, correct?  Is that important to

4    you?

5    A.    Yes.

6    Q.    And is it also fair to say that as part of your job with

7    the City of Worcester, it was important that you be truthful?

8    A.    Yes.

9    Q.    And honest?

10   A.    Yes.

11   Q.    Both with your professional dealings with the grant

12   program?

13   A.    Yes.

14   Q.    And your interactions with your fellow employees at the

15   City of Worcester?

16   A.    Yes.

17   Q.    You talked on direct about the purchase of Unit 504 at 21

18   Illinois Street, correct?

19   A.    Yes.

20   Q.    And just to confirm, you never lived at 21 Illinois

21   Street, Unit 504, correct --

22   A.    That is correct.

23   Q.    -- the entire time you owned it?

24   A.    That's right.

25   Q.    But your testimony is that you planned to have your

1    daughter move there; is that right?

2    A.   Yes.

3    Q.   And that you planned to stay there periodically?

4    A.   Yes.

5    Q.   Okay.  And I think you also testified about that you

6    became aware at some point later about the requirement that

7    certain executive management positions within the City of

8    Worcester establish residency in the City?

9    A.   Yes.

10   Q.   And do you recall when you became aware of that

11   requirement?

12   A.   I believe it was -- actually, I don't recall.  I can only

13   summarize.  I don't recall.

14   Q.   Well, I think you testified you were not aware of it in

15   January of 2011; is that right?

16   A.   No.  I don't know.  I believe I testified I was not aware

17   when I purchased my condo, which was just shortly prior.

18   Q.   Okay.  So you purchased your condo on December 29 of 2010?

19   A.   Yes.

20   Q.   So at least as of December 29 of 2010, your testimony is

21   you were not aware of a residency requirement for EM-level

22   positions?

23   A.   That's correct.

24   Q.   And after that, you can't estimate exactly when you became

25   aware of that requirement?

1    A.    I can estimate.

2    Q.    What's your estimate?

3    A.    I would say sometime in the spring of 2011.

4    Q.    So in the spring of 2011, you became aware of this

5    requirement, correct?

6    A.    Yes.

7    Q.    And is it fair to say that it was not a new requirement in

8    the spring of 2011?

9    A.    That was my understanding, yes.

10   Q.    Did you ever look at the policy for the City of Worcester

11   regarding the residency requirement?

12   A.    I didn't.

13   Q.    Not while you were at the city?

14   A.    No.

15   Q.    How did you hear about it?

16   A.    I believe after disclosing that I had purchased a condo

17   there, I believe it was Julie Jacobson I was chatting with

18   about the purchase of the condo that she mentioned that in July

19   when the chief of staff position became formal through the

20   budget that I would have had an occupancy requirement.

21   Q.    And so your testimony is that you had a conversation with

22   Julie Jacobson in the spring of 2011 after you purchased the

23   condominium at Unit 504, 21 Illinois Street; is that right?

24   A.    Yes.

25   Q.    And that that is when you became aware from Julie Jacobson

1   that in July of 2011, when the budget showed that you were

2   chief of staff, that you would have to establish residency in

3   the city?

4   A.   That I would have a year to establish residency.

5   Q.   Okay.  And did you have an understanding that that was a

6   real thing?

7   A.   Yes.

8   Q.   And did you take the opportunity to look at the policy

9   from or the ordinance from the City of Worcester?

10   A.   No.

11   Q.   When you -- and your testimony is that in December of

12   2010, before you closed on the condo -- well, let me back up

13   even further.

14       In November of 2010, did you know you were going to

15   purchase the condo?  Had you been negotiating the purchase of

16   the condo?

17   A.   Yes.

18   Q.   And in October of 2010, had you been negotiating the

19   purchase of the condo?

20   A.   Yes.

21   Q.   And you're aware that in October, specifically October 21

22   of 2010, Jim Levin sent you a formal offer to sell you a

23   different unit at 21 Illinois Street, correct?

24   A.   I don't know what date it was.  I believe it was prior to

25   that.

1   Q.   You believe it was even prior to October 21st of 2010?

2   A.   Yes.

3   Q.   Okay.  We can get the document and show you to refresh

4   your recollection.  But let's agree to disagree on the date for

5   now.  You told Jim Levin that you couldn't purchase a unit from

6   him, correct?

7   A.   That's correct.

8   Q.   Because you were supervising the 5 May project at that

9   time, correct?

10  A.   No.

11  Q.   What did you tell them?

12  A.   I told him that the city solicitor had advised that,

13  although my disclosure -- although my obligation was

14  disclosure, that it would smell bad.  And as a result of that

15  feedback I got from David Moore, I would not be purchasing a

16  condo from him.

17  Q.   So your testimony is that the city solicitor for the City

18  of Worcester advised you only that it would smell bad if you

19  purchased a condominium that was owned by 21 Illinois Street,

20  LLC, of which Jim Levin was essentially the owner?

21  A.   He said my obligation was disclosure, which is a specific

22  legal term.  And then my supervisors would have the ability to

23  then remove me from projects but that my obligation was

24  disclosure.

25  Q.   So is it fair to say that you could have, in your view,

1    you could have gone ahead and purchased the condo that Jim

2    Levin through 21 Illinois Street, LLC had offered to sell you?

3    A.    If I complied with the legal disclosure, yes.

4    Q.    So you're not suggesting that the disclosure to David

5    Moore was the legal disclosure?

6    A.    No, no.

7    Q.    Okay.  But you nevertheless decided that you weren't going

8    to purchase the unit that Jim Levin through 21 Illinois Street,

9    LLC had offered to sell you?

10   A.    That's correct.

11   Q.    And instead, you were going to purchase a unit at 21

12   Illinois Street that was owned by Curtis Mueller?

13   A.    No.

14   Q.    Unit 504 is what you began discussing, you said, on direct

15   with Curtis Mueller, correct?

16   A.    Yes.

17   Q.    And you ultimately decided that you were purchasing that

18   unit, correct?

19   A.    Ultimately, yes.

20   Q.    Okay.  So my question was, after you decided that you were

21   not going to purchase the unit from 21 Illinois Street, LLC

22   through Jim Levin that he offered you, you decided that you

23   were going to purchase Unit 504 from Curtis Mueller?

24   A.    After seeking a second opinion from David Moore.

25   Q.    Okay.  So you're testifying that now you also spoke with

1    David Moore about your anticipated purchase of Unit 504 from

2    Curtis Mueller?

3    A.    Not specifically 504.

4    Q.    So your testimony is that you sought advice from David

5    Moore regarding the purchase of a unit from Curtis Mueller?

6    A.    No.

7    Q.    What did you seek advice from?

8    A.    I sought advice from David Moore as to whether or not the

9    same disclosure obligation would apply if I elected to purchase

10   a unit from someone other than 21 Illinois Street having a

11   financial interest in a project at 5 May.

12   Q.    Okay.  So when you spoke with David Moore, you indicated

13   that there was a financial interest of someone else in a

14   different unit that you were thinking of purchasing?

15   A.    No.

16   Q.    Okay.  You told him that there wasn't a financial

17   interest?

18   A.    We didn't have that conversation.

19   Q.    So the conversation that you had with David Moore, was it

20   the same conversation as the one that you talked about the 21

21   Illinois Street, LLC unit from Jim Levin?

22   A.    No.

23   Q.    So two separate conversations?

24   A.    Yes.

25   Q.    So let's just focus on the second conversation.  Your

1    testimony is that you spoke with David Moore and asked what

2    your disclosure obligations would be to purchase a unit at 21

3    Illinois Street, LLC from someone who did not have a financial

4    interest in any programs that the City was overseeing?

5    A.    No.

6    Q.    Okay.  Then I have misunderstood.  So tell me what you

7    asked.

8    A.    I asked if I purchased a unit from someone in the same

9    building other than 21 Illinois Street, LLC, do I have the same

10   legal disclosure requirement.

11   Q.    Okay.  So you didn't make any representations to David

12   Moore about who might have owned another unit at 21 Illinois

13   Street?

14   A.    That's correct.

15   Q.    Okay.  All you told him was that if you elected to buy a

16   unit that is owned by anyone other than 21 Illinois Street,

17   LLC, did that trigger the same disclosure obligations?

18   A.    Correct.

19   Q.    Okay.  By December of 2010, presumably you knew that you

20   were purchasing 21 Illinois Street, Unit 504, correct?

21   A.    Yes.

22   Q.    And I believe your testimony on direct was that you had an

23   original closing date earlier in December and that the closing

24   didn't happen that day?

25   A.    That's correct.

1  Q.    Okay.  And then you ultimately did close on the property

2  on December 29 of 2010?

3  A.    Yes.

4  Q.    And between the first closing that didn't happen and the

5  second closing, your testimony was that you had conversations

6  about whether you should go through with the purchase, correct?

7  A.    More so how to go about that.  Not whether I should or

8  not.

9  Q.    And your testimony is that you were told that the tenant

10 would be relocated to a different unit?

11 A.    Yes.

12 Q.    And did you receive that representation in writing from

13 anyone?

14 A.    I did not.

15 Q.    Okay.  And did you know at that point the tenant's name?

16 A.    Yes.

17 Q.    Okay.  Did you reach out to the tenant and have a

18 discussion about that?

19 A.    I did not.

20 Q.    Okay.  So you relied on the representation that the tenant

21 would be relocated within the building?

22 A.    Yes.

23 Q.    And then you showed up to the second scheduled closing on

24 December 29 of 2010, I think you said, exchanged pleasantries,

25 signed the papers and left?

1    A.    Yes.

2    Q.    And your testimony is that during the actual closing on

3    December 29 of 2010, you were not aware that the tenant had not

4    been relocated?

5    A.    Had not been -- he had not been relocated.

6    Q.    Were you aware of that on December 29?

7    A.    Yes, yes.

8    Q.    Okay.  So you became aware of it before you signed the

9    papers?

10   A.    That he still occupied --

11   Q.    Yes.

12   A.    Yes.

13   Q.    And were you still under the impression that he was going

14   to be relocated?

15   A.    Yes.

16   Q.    Okay.  So when did you learn that he was not in fact going

17   to be relocated?

18   A.    It was, I would say, early March.

19   Q.    Okay.  So did you have an understanding as to how long it

20   was supposed to take for the tenant to be relocated?

21   A.    Yes.

22   Q.    And what was your understanding?

23   A.    60 to 90 days.

24   Q.    And did you have a conversation with the tenant at that

25   point as the new owner of that unit about this purported

1    agreement to relocate him?

2    A.    No.

3    Q.    Did you have a conversation with Curtis Mueller after the

4    closing about the progress of relocating this person?

5    A.    No.

6    Q.    Did you have a conversation with Jim Levin after the

7    closing about the timeframe or the process for relocating the

8    tenant?

9    A.    No.

10   Q.    Did you have a conversation with anybody about that after

11   December 29, 2010?

12   A.    Yes.

13   Q.    Who did you have a conversation with?

14   A.    Christine Carey.

15   Q.    And at some point you learned, you said I think early

16   March, that he was not being relocated; is that right?

17   A.    I assumed as a result of him still being in the unit that

18   he was not relocating.

19   Q.    Okay.  Well, is it fair to say that, after the closing,

20   you didn't have your daughter pack her things up and go there

21   to move in?

22   A.    No.

23   Q.    Okay.  And you didn't try to stay overnight there while

24   you were working late on any evening?

25   A.    At 504, no.

1   Q.   Okay.  But you did take steps within the City to change

2   your address, correct?

3   A.   I did.

4   Q.   Okay.  And I think we've already seen some of these

5   exhibits previously.  I'm displaying Exhibit 360.

6           MR. CORSO:  350.

7           MS. DINEEN JERRETT:  Sorry.  350.  Thank you, Mr.

8   Corso.

9           MR. CORSO:  You're welcome.

10  Q.   And this is a change form that you recognize from the City

11  of Worcester, correct?

12  A.   No.

13  Q.   Is that your signature at the bottom, or is that somebody

14  else's?

15  A.   That is not my signature.

16  Q.   But it indicates Jacquelin Vachon-Jackson, correct?

17  A.   Yes.

18  Q.   And it indicates February 24 of 2011, correct?

19  A.   Yes.

20  Q.   Do you recognize that employee number as you?

21  A.   I wouldn't know.  I just didn't know my employee number.

22  Q.   Okay.  Do you recognize the employee name as you?

23  A.   Yes.

24  Q.   And it says "Old information."  Do you recognize that

25  address?

1    A.   I do, but it's not the address that would have been --

2    that I have at the City of Worcester.  That was a much older

3    address.

4    Q.   So at any time that you worked at the City of Worcester,

5    was that your address?

6    A.   Upon my hire, yes.

7              THE COURT:  Ms. Dineen Jerrett, let's do this.  We're

8    going to break.  You can step down, Ms. Sutcivni.

9              Ladies and gentlemen, so we're going to break.  We

10   will see you back here Monday, August 2.  And I don't think

11   we've got a lot left.  So why don't you plan on staying all

12   day.  And this may change, and if it does, we will reach out to

13   you, but we are hoping that -- and this may change, but we are

14   hoping that you will actually begin deliberations.  That may

15   change, like I said.  Yes?

16             THE JUROR:  Your Honor, what does "all day" mean in

17   terms of end time?

18             THE COURT:  So you're going to go, what happens is, if

19   you get the case on Monday or whatever day you get it, we will

20   check back with you at 4:30, 5:00 to see where you stand and

21   whether you want to remain for a while or return the following

22   day, and then we just keep doing that until you tell us you

23   have achieved a verdict.  Okay?

24             THE JUROR:  Thank you.  Thank you.

25             THE COURT:  All right.  Now more than ever, please

1    don't discuss the case with anyone, and that includes social

2    media, family, friends, each other.  Don't read any media

3    accounts, because there have been some.  And we will see you

4    back here in a week.  Thank you so much on behalf of all of us.

5             (Jury exits the courtroom.)

6             THE COURT:  8:30 Monday we'll have a charge

7    conference.  Did you all get the instructions?

8             MS. DINEEN JERRETT:  Yes.

9             MR. GRIFFIN:  Yes, Your Honor.

10            THE COURT:  See you then.  Enjoy -- I know you won't,

11   but try to enjoy your week off.

12            MS. DINEEN JERRETT:  You as well.

13            MR. CORSO:  Have a safe trip.

14            (Adjourned, 12:57 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1              CERTIFICATE OF OFFICIAL REPORTER

2

3          I, Kelly Mortellite, Registered Merit Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter to the best of my skill and ability.

9                  Dated this 24th day of July, 2021.

10

11                 /s/ Kelly Mortellite

12                 _____

13                 Kelly Mortellite, RMR, CRR

14                 Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25