UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                              )
UNITED STATES OF AMERICA,     )
                              )          Criminal Action
          Plaintiff,          )          No. 16-40031-TSH
                              )
v.                            )
                              )
JACKLYN M. SUTCIVNI,          )
                              )
          Defendant.          )
                              )
```


BEFORE THE HONORABLE TIMOTHY S. HILLMAN
UNITED STATES DISTRICT JUDGE

* * * E X C E R P T * * *

JURY TRIAL DAY NINE

TESTIMONY OF JACKLYN SUTCIVNI


July 22, 2021


United States District Court
Courtroom No. 2
595 Main Street
Worcester, Massachusetts


Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way
Boston, Massachusetts  02210
mortellite@gmail.com

1    APPEARANCES:

2    On Behalf of the Government:
     Michelle L. Dineen Jerrett
3    Danial E. Bennett
     U.S. Attorney's Office - MA
4    595 Main Street
     Suite 206
5    Worcester, MA 01608
     508-368-0102
6    Michelle.Dineen.Jerrett@usdoj.gov

7    On Behalf of the Defendant:
     Joseph M. Griffin, Jr.
8    Joseph M. Griffin, Jr., Attorney at Law
     15 Court Square
9    Suite 240
     Boston, MA 02108
10   617-742-1663
     josgriffin@msn.com
11
     Frank C. Corso
12   Corso Law LLC
     492 Winthrop Street
13   Suite 5
     Rehoboth, MA 02769
14   774-901-2677
     fcc@corsolaw.com

15

16

17

18

19

20

21

22

23

24

25



INDEX


WITNESS                                                      PAGE


JACKLYN SUTCIVNI

    Direct Examination By Mr. Griffin                          4

```
1                              * * * * *
2              THE COURT:  Mr. Griffin, the Government having rested,
3     does the defendant intend to present any evidence?
4              MR. GRIFFIN:  Yes, Your Honor.  The defense calls
5     Jacklyn Sutcivni.
6                    JACKLYN SUTCIVNI, DULY SWORN
7              COURTROOM CLERK:  Please state your name and spell
8     your last name for the record.
9              THE WITNESS:  My name is Jacklyn Sutcivni.  Last name
10    is S-u-t-c-i-v-n-i.
11             MR. GRIFFIN:  May I proceed?
12             THE COURT:  You may.
13    DIRECT EXAMINATION BY MR. GRIFFIN:
14    Q.   Good afternoon.
15    A.   Good afternoon.
16    Q.   Could you please introduce yourself to the jury.
17    A.   My name is Jacklyn Sutcivni.  I am from Dracut, mom of two
18    children.
19    Q.   Let me ask you some questions.  Where do you live?
20    A.   I live in Dracut, Massachusetts.
21    Q.   How long have you lived there?
22    A.   Since 2009.
23    Q.   All right.  And who do you live with?
24    A.   I live with my -- currently my mother, my elderly mother,
25    and my oldest daughter.
```

1  Q.   And do you have any other children?

2  A.   I have a younger daughter.  She lives in Arlington.

3  Q.   How old are your children?

4  A.   They are 27 and 24.

5  Q.   Are you married?

6  A.   Divorced.

7  Q.   Ms. Sutcivni, what is your understanding of the charges

8  against you?

9  A.   I understand that I've been federally indicted for

10  conspiring with a Mr. James Levin to defraud the United States

11  of America via wire, electronic wire fraud.

12  Q.   Do you deny that?

13  A.   Absolutely.

14  Q.   Let's talk a little bit about your background.  Where were

15  you born?

16  A.   Lowell, Massachusetts.

17  Q.   Have you lived in Massachusetts your entire life?

18  A.   Yes.

19  Q.   Where did you go -- tell us about your schooling.  Where

20  did you go to school?

21  A.   I went to grade school in the Centerville neighborhood of

22  Lowell, blue-collar, working class.  I went on to graduate from

23  Worcester -- I'm sorry -- Lowell High School, Class of 1991.

24  From there I went on to Worcester State College at the time.

25  It is now Worcester State University.

1   Q.   And when did you graduate from college again?  I

2   apologize.

3   A.   Ultimately not until 2009.  I left in my senior year with

4   six credits remaining due to a job offer I could not refuse.

5   Q.   Okay.  Did you ever take any master's classes?

6   A.   I did.

7   Q.   Did you get a degree?

8   A.   No.

9   Q.   How come?

10  A.   I just have not finished.

11  Q.   Okay.  What about your work history as an adult?

12  A.   As an adult, primarily in government most of my life.

13  Q.   And before that, sort of during college and after

14  graduation, did you have any sort of appreciable work history?

15  A.   Yes.

16  Q.   What was that?

17  A.   I worked full time through college as well as a certified

18  nursing assistant.

19  Q.   And was there a gap in your work history sort of between

20  then and when you finished your degree?

21  A.   No.  I continued to work full time, and I would always

22  take courses as I'm working.

23  Q.   Okay.  So going to the nursing assistant job, how long did

24  you do that?

25  A.   Approximately eight years.

1   Q.   And what was your next job after that?

2   A.   I was a home visitor for UMass Memorial Visiting Nurses

3   Association.

4   Q.   After that do you recall your next position?

5   A.   After that I went on to, I believe it was the State

6   Department of Public Health Childhood Lead Poisoning Prevention

7   Program.

8   Q.   And what year would that have been, if you remember?

9   A.   It was approximately 1999.

10  Q.   And did you say the Department of Public Health?

11  A.   Yes.

12  Q.   So did that begin your sort of entry into government

13  administration positions?

14  A.   Yes.

15  Q.   How long were you at the Department of Public Health?

16  A.   Approximately six years, I believe.

17  Q.   And why did you leave that position?

18  A.   The director of the program at the public health

19  department where I worked stated that there were a lot of

20  vacancies and difficulty with filling positions in local

21  municipal childhood lead poisoning programs which provide the

22  dollars to do the actual de-leading for the children that I was

23  monitoring with lead poisoning.

24  Q.   Did you become aware of a particular position?

25  A.   Yes.

1    Q.    And what was that?

2    A.    Somerville, Massachusetts.

3    Q.    And what was the position?

4    A.    It was the Somerville lead abatement manager position.

5    Q.    And did you apply for and interview for that position?

6    A.    I did.

7    Q.    And what happened as a result of that?

8    A.    I was ultimately hired to manage the program.

9    Q.    In the City of Somerville?

10    A.    Yes.

11    Q.    Do you remember when you started?

12    A.    I believe that was 2000 or 2001.

13    Q.    Okay.  And what were your duties and responsibilities in

14    the City of Somerville?

15    A.    Was to administer HUD-funded lead paint abatement

16    programs.

17    Q.    And what specifically did you do?

18    A.    I did just that.  So my job was to take applications from

19    interested parties, homeowners, sometimes investor owners, and

20    process those applications in accordance with HUD federal

21    regulations and the City's priorities and ultimately de-lead

22    those properties with state-certified contractors.

23    Q.    Okay.  What types, what kinds of dollars are we talking

24    about in the early 2000 Somerville Lead Abatement Program?

25    A.    Relatively small grants, usually anywhere from 2,000, I

1    would say probably the highest amount would be 20,000.

2    Q.    Okay.  And did you have any other specific duties besides

3    what you just described to us in Somerville?

4    A.    Not generally.  On occasion we'd help out, if other

5    departments had mailings that needed to go out, stuff envelopes

6    and the like.

7    Q.    So going back to the lead abatement program, do I

8    understand you correctly that sort of homeowners that owned a

9    single-family home would apply for these funds and receive them

10   and do the lead abatement work?

11   A.    Correct.

12   Q.    And lead abatement is essentially just removing lead paint

13   from inside your house?

14   A.    Yes.

15   Q.    Okay.  And did that require an inspection, if you know?

16   A.    Yes.

17   Q.    Okay.  Was the inspection before or after or during a

18   particular project in Somerville, I'm talking about?

19   A.    All of the above.

20   Q.    And did you do the inspections?

21   A.    No.

22   Q.    Do you remember who or what role that person was that did

23   the inspections in Somerville?

24   A.    So the lead abatement in Massachusetts is managed by state

25   law and regulation.  The inspectors that perform lead paint

1    inspections are licensed in the State of Massachusetts.  There

2    was, on staff we had what we call a rehab specialist whose job

3    it was to perform inspections essentially to ensure that the

4    work that's happening is in accordance with law and that the

5    project is moving.

6         And ultimately at the completion of the project, the

7    state-licensed lead paint inspector returns to provide the

8    notice of abatement or the letter of full abatement.  That is

9    the legal document that shows that properties have been legally

10   abated.

11   Q.   Okay.  And these individual abatement projects, did they

12   move rather quickly, or did they take a long period of time?

13   A.   It varies.  The application process could be tedious for

14   some.  In particular, investor owners, it was difficult to get

15   tenants to turn in personal financial information to verify

16   income.  The funds had to be provided to low- and

17   moderate-income properties.  So it really did vary.  An

18   owner-occupant with a poisoned child was much more motivated to

19   move quickly in an investor-owned building with tenants.

20   Q.   In Somerville, if you recall, when were the funds released

21   to the person that was doing the work?

22   A.   Typically at the completion of the project, although there

23   were certainly occasions where funds could be provided in

24   advance so that the contractor would be able to purchase the

25   materials, encapsulation materials and/or pay for labor needed.

1        The City of Somerville utilized as part of an economic

2   development program low-income local workers.  And despite

3   being licensed as lead paint abatement contractors, they did

4   not always have high enough incomes to be able to afford the

5   purchases of materials up front.  So in order to support local

6   economic development, we would provide some portion of the

7   funds up front.

8   Q.   While at the City of Somerville, did you have the ability

9   to issue payment?

10  A.   I did not.

11  Q.   And how many years were you there?

12  A.   I believe seven years.

13  Q.   And when you worked at Somerville, where did you live?

14  A.   I lived in Lowell, Dracut.

15  Q.   In the Lowell/Dracut area?

16  A.   Yeah.  So I actually lived in Lowell actually.  I had not

17  moved to Dracut until after leaving Somerville, so I lived in

18  Lowell.

19  Q.   Okay.  Then towards the end of your tenure at Somerville,

20  did your position or your role change?

21  A.   Yes.

22  Q.   What did it change to?

23  A.   I was really just -- I didn't have a formal title.  I

24  don't believe my title really ever changed, but the Director of

25  Housing there left kind of toward the end of my tenure, and I

1    had a functional title of housing director.

2    Q.    In the City of Somerville?

3    A.    Yes.

4    Q.    What did you do in that role?

5    A.    Really it was the same work that I was doing under lead

6    paint abatement, ultimately just rolling in another smaller

7    rehab program that was funded under something called a

8    Community Development Block Grant.

9    Q.    Were NSP grants, did they exist at this time?

10   A.    No.

11   Q.    What year, roughly, are we talking about?

12   A.    I believe NSP was funded in 2008 through something called

13   HERA.  It was the economic recovery act that was signed I

14   believe by President Obama.

15   Q.    Okay.  But my question was what year were you in this role

16   in Somerville?

17   A.    In Somerville, I vacated there in June of 2008.

18   Q.    And you said that you had dealt with CDBG grants.  What

19   are those?

20   A.    CDBG is also a federal government funding source,

21   Community Development Block Grant.  And those funds can be used

22   for a variety of reasons, everything from public services like

23   food pantries to housing renovation and rehab.  And each

24   municipality in the State of Massachusetts decides how they

25   best want to utilize those funds and submits an action plan to

1    HUD for approval from HUD to be able to use those funds for

2    that purpose.

3    Q.    Okay.  Did there come a time when you left your employment

4    in the City of Somerville?

5    A.    Yes.

6    Q.    And tell me again roughly when that was.

7    A.    June 2008.

8    Q.    Okay.  Was there a specific reason or reasons why you left

9    Somerville?

10   A.    Yes.

11   Q.    What -- can you enlighten us about that?

12   A.    The same director who had suggested that I leave public

13   health to go to the renovation side contacted me again in my

14   role in Somerville and suggested that there was a very similar

15   position, a lead paint abatement program manager position that

16   was open in Worcester, Massachusetts, and that Worcester was

17   having a difficult time hiring for that position.  And at the

18   time Worcester also had one of the highest numbers of poisoned

19   children in the state and felt that it was important to try to

20   get those lead abatement funds on the street.

21   Q.    So are you telling us that you learned about a potential

22   opening in the City of Worcester?

23   A.    Yes.

24   Q.    And just to backtrack for a moment, with regard to

25   grant-writing in the lead sort of universe, did you do that as

1    well?

2    A.    Yes, I was doing that in the City of Somerville when I was

3    employed as their program manager.

4    Q.    Okay.  So did you follow up on this lead that you had with

5    regard to the lead abatement position in the City of Worcester?

6    A.    I did.

7    Q.    Okay.  And was there anything about the change of scenery,

8    if you will, that was attractive to you?

9    A.    Not so much attractive.  Other than the move there to

10   Worcester, I thought I might be able to finish my degree

11   because I had attended Worcester State College, so I thought,

12   you know, I might ultimately be able to complete my bachelor's

13   degree.

14   Q.    So what steps did you take with regards to investigating

15   or looking into the position of the City of Worcester?

16   A.    I contacted the Director of Housing for the City of

17   Worcester and spoke about the position with him.

18   Q.    Okay.  So at that time you were still working at

19   Somerville and doing a little independent contracting?

20   A.    Yes.

21   Q.    Okay.  And did you ever do any work -- prior to working

22   for the City of Worcester, did you ever do any work for the

23   City of Worcester?

24   A.    I did.

25   Q.    And what was that?

A.   The grant that they received for HUD funds I had actually written for them.

Q.   And did you apply for the position in the City of Worcester?

A.   I did.

Q.   And tell us what happened next.  Was there an interview?

A.   Yes.  It was actually a quite lengthy interview process. I had -- I guess the director there in Worcester had told me that there were several internal delays for hiring, and I think I began my interview process there sometime in February and was given a start date of April.  After giving my notice and leaving Somerville, I was then told that my start date would be delayed.

Q.   Delayed until when?

A.   Until June 8.

Q.   Of what year?

A.   Of 2008.

Q.   Did you accept the position?

A.   I did.

Q.   Was it a step up in terms of pay for you?

A.   It was slightly higher pay.  My position in Somerville had actually dropped to three-quarter time, so Worcester was going to be full time, back to full-time employment.

Q.   What if anything did you know about the lead abatement program in the City of Worcester at the time that you were

1    applying and accepting this position?

2    A.   I knew that they had a small, what they were referring to

3    as a much smaller program.  It was not, I believe, HUD-funded,

4    and they were just utilizing block grant funds for renovation

5    for poisoned children but that that program was being

6    administered through one of the local non-profits and that this

7    would be the first HUD-funded lead paint abatement program in

8    the City of Worcester.

9    Q.   Meaning administered in and by the City?

10   A.   Correct.

11   Q.   And did you have an understanding about what division

12   within the City of Worcester this lead abatement program was in

13   or going to be in?

14   A.   Yes.

15   Q.   What was that?

16   A.   The Division of Neighborhoods and Housing Development.

17   Q.   And were there any other divisions in that -- were there

18   any other, I should say departments, within that division?

19   A.   Housing was one department under the Division of

20   Neighborhoods and Housing.  I believe others included business

21   retention, and I think there was something to do with public

22   services.  It was like public outreach, something to that

23   nature.

24   Q.   Okay.  And what about these programs that we've been

25   talking about lead, CDBG, NSP, where did they fall, if you

1   understood it at all at that time, within the City of

2   Worcester?

3   A.   They were in the housing division specifically.

4   Q.   So you started in June of 2008.

5   A.   Yes.

6   Q.   And what was the position again?

7   A.   I was the Worcester lead paint abatement program manager.

8   Q.   And did you have a staff?

9   A.   Not at that time.

10  Q.   So was there anybody below you?

11  A.   No.

12  Q.   So what about inspections, how did that get done?

13  A.   So the inspections for lead were what we call

14  subcontracted out to one of the local non-profits.

15  Q.   And did you have an understanding about the individuals

16  that were engaged to do those inspections?

17  A.   At the time I don't believe -- I believe that position was

18  still vacant.

19  Q.   I'm talking about the people that actually did the

20  inspections from this outside agency.  Do you remember not

21  necessarily who they were but what their qualifications were?

22  A.   Yes, they were rehab specialists, what's known as rehab

23  specialists.

24  Q.   Okay.  So when you step into this new role in this new

25  program, what did you have to do?

1   A.   I had to essentially create the program from scratch.   So

2   there were HUD funds, but with those funds, like any government

3   funding source, there are significant regulations that need to

4   be followed for compliance.   And my job was to develop

5   essentially this program that would meet the HUD requirements

6   while also balancing what is available in the City of Worcester

7   relative to, you know, their payment mechanisms and how all the

8   internal processes work.   So it requires an evaluation

9   essentially of both federal regulations and internal city

10   processes.

11   Q.   And did you have an understanding of what the internal

12   city sort of processes overall were at that time?

13   A.   Not on my date of hire, certainly, but I ultimately became

14   aware of them.

15   Q.   Okay.   So can you describe sort of the -- we'll call it

16   the plan program workflow.   How did it sort of work?

17   A.   Applications could come in via two what we call points of

18   entry.   Anybody interested in obtaining the funds could apply

19   either directly to the City or through one of our partnering

20   agencies which was called the NeighborWorks HomeOwnership

21   Center.   So applications could be taken at either location.

22       And once applications are received, there's a process for

23   ensuring eligibility for not only each property itself but then

24   also the recipients of the funds and/or the beneficiary of

25   those funds.   And there is also a legal process as a result of

1    lead paint abatement being statutory in Massachusetts.  So

2    there's a legal requirement for licensed inspectors and for

3    obtaining what's called full lead paint abatement, which is

4    also a fairly legal term which landlords are required to do in

5    Massachusetts for any time they rent a unit with children under

6    six.

7    Q.    Okay.  Again, what kind of dollars are we talking about in

8    this lead abatement program?

9    A.    Worcester was a slightly different community, so it could

10   vary as a result of the number of units that are being abated.

11   So certainly a two-family property is not going to have the

12   cost of a 40-unit apartment building.  So it really did vary

13   significantly, anywhere I would say on the low end $5,000 to,

14   it could be as much as $250,000.

15   Q.    Okay.  Now, how long did you stay in the lead abatement

16   position in the City of Worcester?

17   A.    From June of '08 until approximately September of 2009.

18   Q.    Okay.  And what happened in September of 2009; what

19   position did you transition into?

20   A.    I transitioned into the Neighborhood Stabilization Program

21   coordinator position.

22   Q.    Okay.  And who, if you know, was the person that was in

23   that position before you?

24   A.    It did not exist.

25   Q.    So that was also a newly created position?

1    A.    Correct.

2    Q.    And what was your understanding about why that position

3    was created at that time?

4    A.    Worcester was a recipient of HUD Neighborhood

5    Stabilization Program funding through a number of complex

6    mechanisms.  And that particular funding source, also known as

7    NSP, had regulatory timelines, meaning that when Congress voted

8    those funds, they gave municipalities a very specific timeline

9    and order by which they needed to meet very specific

10   requirements, including contracting and expenditure, or those

11   funds would be returned to HUD and then ultimately potentially

12   back to the general fund, I would assume for the United States.

13        So in that position the City had had funding for I believe

14   approximately a year at that point and had not had any success

15   in moving the program forward, and the timelines were ticking,

16   so the position was created.  Ultimately I was given the

17   direction to establish that program as I did the lead paint

18   abatement program and to get that money on the street.

19   Q.    So let's break it up for a minute.  When you left the lead

20   abatement program position, who took over that role from you?

21   A.    Nobody.

22   Q.    So who then administered the lead abatement program?

23   A.    I did.  I absorbed both positions.

24   Q.    Okay.  So you did both positions simultaneously?

25   A.    Yes.

1   Q.   When you made the transition to NSP, who did you report

2   to?

3   A.   To Dennis Hennessy.  He was the executive director for the

4   Division of Neighborhoods and Housing Development.

5   Q.   Okay.  If I said the term "agency director," would that --

6   A.   Correct.

7   Q.   -- make more sense?

8   A.   Yes, Division of Neighborhoods and Housing Development

9   internally in the City of Worcester was called "the agency,"

10  yes.

11  Q.   And do you know who was above Dennis Hennessy?

12  A.   Julie Jacobson.

13  Q.   And what was her role at the time, if you know?

14  A.   She was the Assistant City Manager for the Division of

15  Economic Development.

16  Q.   And do you know who would have been above her,

17  Ms. Jacobson?

18  A.   Michael O'Brien, City Manager.

19  Q.   Now, the NSP program, was there anyone, if we're thinking

20  of this as a flow chart, was there anyone below you?

21  A.   Yes.  There was a program manager, Patrick Murphy.  There

22  was a rehab specialist, Bob Shaw.  There formerly was also a

23  position above me called the housing director, which would have

24  been Mr. Scott Hayman.

25  Q.   So what was Bob Shaw's role?

A.    Bob Shaw was the rehab specialist.  His position and his

role would have been to evaluate properties to try to develop a

scope of work essentially to bring foreclosed -- these

properties, NSP funds are eligible only to foreclosed and

abandoned properties.

Q.    Are they also available for rehabilitation purposes?

A.    Yes, that is the purpose of the funds.  So again, because

NSP falls under these Community Development Block Grant

regulations, any municipality receiving these funds would apply

to HUD with something called an action plan, and that action

plan ultimately would be approved by HUD, which would

essentially be a contract between the City and HUD relative to

what our local plans are for the use of those funds.

Q.    Okay.  I'm sorry, were you not finished?

A.    No.  Go ahead.  Thank you.

Q.    Let's make sure we establish, what sort of timeframe are

we talking now when you go into this NSP program, what is the

year, month, if you remember?

A.    It is September of 2009.

Q.    Okay.  And did you have a title?

A.    Yes.

Q.    What was it, do you recall?

A.    Neighborhood Stabilization Program Coordinator.

Q.    Okay.  And what were your responsibilities in that role?

A.    Was to develop the Neighborhood Stabilization Program.  So

1    the City was the recipient of a fairly significant of amount of

2    funds at the time, and the timeline is ticking.  And Worcester

3    was also one of the hardest hit communities in the State of

4    Massachusetts with foreclosures, and the city manager charged

5    me with developing the program and getting the funds out the

6    door essentially.

7    Q.    So had you had any experience prior to this with, we'll

8    just call it NSP money, these grants?

9    A.    No.  They did not exist prior to 2008.

10   Q.    Okay.  And if you know, did the City of Worcester have any

11   experience with these NSP grants?

12   A.    The housing director had a year at least since NSP had

13   come into the city since the funds became available, so

14   certainly the housing director and Dennis Hennessy as well as

15   Julie Jacobson would have had some experience with trying to

16   establish the program.

17   Q.    Okay.  And what was your understanding about sort of if

18   there were any policies and procedures in place at that time,

19   or should I say how things were done?

20   A.    At that time it was my understanding that there were no

21   formal policies and procedures in place.

22   Q.    Did you have an understanding about how things were done

23   in terms of the NSP process?

24   A.    It was part of my job in that position to develop that in

25   fact, how things were going to be done and to develop the

```
 1   policies and procedures.
 2   Q.   And did you have a hand in developing the policies and
 3   procedures?
 4   A.   I did.
 5   Q.   And what did you come up with?
 6   A.   I ultimately recommended and ultimately fashioned the
 7   program after the lead paint abatement program that I had been
 8   managing.  Part of the reason for moving positions is that I
 9   was told that the lead paint abatement program was functioning
10   so well that they believed I might be able to do the same thing
11   with NSP.
12   Q.   Now, did there come a time in the NSP universe where your
13   role changed again?
14   A.   Yes.
15   Q.   And when was that?
16   A.   That was approximately September, I believe, of 2010.
17   Both staff positions for that grant, NSP, the program manager,
18   Pat Murphy, and the rehab specialist, Bob Shaw, the staffing
19   portion of the funds had been expended by then, so both of
20   those positions were ultimately eliminated.
21   Q.   So what happened to Bob Shaw's position?
22   A.   It remained vacant.
23   Q.   What happened to Patrick Murphy's position?
24   A.   It also remained vacant.
25   Q.   And what did Patrick Murphy do?
```

1    A.    He was the program manager for NSP.

2    Q.    So who replaced Mr. Murphy?

3    A.    Nobody.

4    Q.    Who replaced Mr. Shaw?

5    A.    Nobody.

6    Q.    And were any grants being processed; was any work being

7    done?

8    A.    Yes.

9    Q.    Can you give us an example?

10   A.    I was moving projects from both the NSP and the lead paint

11   abatement program as best I could.

12   Q.    Okay.  Now, so what year and month are we now, roughly?

13   A.    We would be September of 2010.

14   Q.    Would it be 2009, would that sound more realistic?

15   A.    September 2009 I moved into the position.  Pat Murphy and

16   Bob Shaw did not vacate their positions until September 2010.

17   Q.    Okay.  So let's get back to sort of the beginning.  You

18   had said earlier that -- and tell us, I suppose, did the NSP

19   money have to be committed by a certain period of time, within

20   a certain timeframe?

21   A.    Yes.  So when I was asked to take over the NSP program,

22   the funds were required to have what's called a commitment.  I

23   believe it was December of 2009.  So I was only given a very

24   short time to have commitments and to have all the funds

25   ultimately committed, if you will.

1   Q.   Did you know what that period of time was?

2   A.   It would have been just a short three months from early

3   September through the end of December.

4   Q.   Okay.  And you had discussed that at this point there were

5   -- later on there were people below you that were in the

6   program whose positions were eliminated.  Were there any

7   changes to the positions that were above you?

8   A.   Yes.  So when moving into my role as NSP program

9   coordinator, there had been a director of housing, Scott

10  Hayman, who ultimately hired the two staff people, Pat Murphy

11  and Bob Shaw.  And Mr. Hayman had gone on extended

12  administrative leave.  So when taking that position, he was not

13  available again actually.  I didn't see him in that -- in my

14  role again.

15  Q.   And what if anything became of that role, Mr. Hayman's

16  role?

17  A.   It was vacant.

18  Q.   Okay.  And did you take any role in assuming any of those

19  responsibilities?

20  A.   Yes.

21  Q.   What was that?

22  A.   I was also asked then to administer the HOME Program, the

23  HOME Investment Partnership Program and to take on I would say

24  the majority of the roles of the position relative to all of

25  the, I guess for lack of a better word we call it like public

1    outreach, so anything that was relating to being a

2    representative for the City of Worcester Housing Division,

3    attending conferences, speaking about funding that's available,

4    any of those things and then all of the internal administration

5    of all of the funding sources.

6    Q.   Okay.  So as you assume these various roles, did along the

7    way you have title changes?

8    A.   Yes.

9    Q.   And what was your understanding about the changes in

10   title?

11   A.   The City would have -- we had essentially two titles.  We

12   had a budgetary title, which is according to the city budget

13   that goes in the actual budget-labeled position that you fill,

14   and then we had functional titles that were also given.

15        The city manager could in fact promote to a functional

16   title, but depending on the pay grade of certain positions, per

17   city ordinances, they did not become available until the budget

18   was voted in midsummer each year.

19   Q.   And were you promoted along the way?

20   A.   I was promoted.

21   Q.   And did you hear the testimony earlier in this trial about

22   the difference between an M position and EM position?

23   A.   Yes.

24   Q.   And what's your understanding of that difference?

25   A.   EM is executive management.  There are very specific city

ordinances that describe the rules and responsibilities of
those positions.  They generally are what we call cabinet-level
positions.  You typically work either directly for or
immediately under the city manager but not always, but that's
typical.  And the EM positions are the positions that have the
authority to essentially encumber funds and to make payment of
those funds.

Q.   Okay.  So is this roughly like September of '09, this
period of time we're talking about now?

A.   Yes, September of '09 I was officially promoted to
Neighborhood Stabilization Program coordinator, but as a result
of the vacancy to the position of housing director, I was
simply asked to take on those responsibilities.

Q.   Okay.  And at this point in time had you ever met Jim
Levin?

A.   Not in September, no.

Q.   Okay.  Do you remember when you first met him?

A.   I believe it was November, I believe, very early November.
It could have been October, but it was certainly after I was
promoted to that position.

Q.   And just in very general terms, what was the context in
which you met him?

A.   Mr. Murphy, who is the program manager, came into my
office and informed me that there was a developer who was
asking to meet with city staff about the NSP program, and

1    Mr. Murphy stated that he believed it would be helpful for me

2    to attend.

3    Q.    Okay.  And did you attend that meeting?

4    A.    I did.

5    Q.    Who else was there?

6    A.    Myself, Mr. Pat Murphy, Mr. James Levin, Mr. Denys Levin,

7    who I believe is James's son, Curtis Mueller, and there was

8    actually one other person present.  I don't remember his name.

9    He was a very young man.  I think he might have been an intern.

10   Q.    And what was the subject of that meeting?

11   A.    Essentially just the Neighborhood Stabilization Program.

12   It was Mr. Levin inquiring as to how he might be able to

13   partner with the City in order to develop properties and to

14   obtain federal funds.

15   Q.    And, if you know, was Mr. Levin the only developer who was

16   interested in this program?

17   A.    No, not at all.

18   Q.    What can you tell us about that?

19   A.    As a result of the number of meetings that I had been

20   asked to participate in, all relative to the same topic, the

21   City held an outreach session specifically for investor/owners

22   at the time.  That was public, publicly available, and it was

23   marketed to the general public.

24   Q.    By the City of Worcester?

25   A.    Yes.

1    Q.   And you sort of glossed over what exactly was done.  Do

2    you remember what exactly was done in terms of this outreach?

3    A.   Yeah.  The City organized an information session where

4    folks were invited to City Hall, pamphlets had gone out, and

5    the City was marketing the program, and the city manager as

6    well as Julie Jacobson, the assistant city manager, provided

7    information on not only the NSP program but all city funding

8    sources and also provided I guess what I call a list of

9    properties to be specifically targeted for use for NSP.

10   Q.   And who attended these types of meetings?

11   A.   It was developers, investor owners, anybody interested in

12   accessing funds or hearing more about the program.

13   Q.   And what about on the City side, who went to those

14   meetings?

15   A.   The city manager I believe popped in there.  He didn't

16   stay, but he gave a brief introduction, Julie Jacobson

17   certainly, Dennis Hennessy, myself, Pat Murphy, Bob Shaw, and I

18   believe Larry Escobar who ultimately was staff assistant in the

19   lead paint abatement program.

20   Q.   Okay.  And from the City's perspective, why were these

21   meetings being held?

22   A.   The City was looking to partner essentially with

23   developers, so there was at the time -- I don't want to --

24   there was a push to develop public-private partnerships.  The

25   city manager used to say it was very sexy to have a

1   public-private partnership.  That was his word.  And he felt

2   that it was marketed as a way to essentially tap in -- for

3   developers to be able to tap into public funding sources but

4   also for municipalities to be able to access the deep pockets

5   of well-funded developers and investors in order to effectuate

6   local development plans.  So the City of Worcester had lots of

7   plans and the city manager had lots of plans in how to

8   effectuate redevelopment.

9   Q.   At the time of these meetings, this NSP money was

10  available to the City of Worcester?

11  A.   Yes.

12  Q.   And it had to be disbursed by a certain period of time?

13  A.   Yes.

14  Q.   Certain time, I should say.

15  A.   It had to be committed by December.

16  Q.   Was there more than one of these meetings?

17  A.   Yes.  Not specifically for NSP however.

18  Q.   Okay.  Do you recall the first project that was considered

19  for funding?

20  A.   I don't.

21  Q.   Nonetheless, were there several projects that were either

22  considered for funding or people were interested in?

23  A.   Yes, there were already a number of applications pending

24  on just different properties throughout the city.  Many early,

25  very early applicants actually ended up falling off of that

1    list as a result of the properties not being located in

2    specific census tracts that were required by the funding

3    source.

4        So prior to my taking that position, the City had not been

5    looking towards census tracts as an eligibility requirement.

6    However, in the City, our City of Worcester's action plan, we

7    submitted a plan to HUD that required the properties be located

8    in very specific census tracts in order to be eligible.

9    Q.    Okay.  So ultimately do you have a sense of how much

10   activity happened, how many loans were processed, this kind of

11   thing?

12   A.    Yes.  I believe there were somewhere around 36 different

13   NSP properties that were ultimately targeted.

14   Q.    Okay.  So the process began with an application; is that

15   right?

16   A.    Yes.

17   Q.    And who did the applications go to?

18   A.    Patrick Murphy, the program manager.

19   Q.    Okay.  Do you know if Jim Levin by himself or some entity

20   submitted an application?

21   A.    He did.

22   Q.    Do you know when that was?

23   A.    It would have been just shortly after our initial meeting,

24   so I want to say the end of October or very early November.

25   Q.    Okay.  And were there any requirements that you were aware

1    of of what developers or contractors had to do sort of

2    initially to begin to be in a position to deal with the project

3    like 5 May or one that might receive NSP money?

4    A.    Yes.  So it's important for me to differentiate between

5    developers and contractors.

6    Q.    Please, go ahead.

7    A.    They are not the same.  They are actually legal entities

8    under HUD contracting guidelines, so the requirements for a

9    contractor will be very different than the requirement for a

10   developer.

11   Q.    Why don't you take developer first.

12   A.    So for developers, we were looking for location of the

13   targeted property.  It had to fall within certain census

14   tracts.  We were looking for financial stability, essentially

15   history of successful redevelopment, and also would obtain

16   financials from the developer and/or the entity that was going

17   to utilize the funds to ensure that there was enough funding

18   available to make the project that we were considering viable.

19   Q.    Did you have an understanding about the relationship

20   between a developer and a developer's entity, was there any

21   connection there?

22   A.    Yes.  So for NSP funds and for any development, we --

23   government employees, I say "we" -- still look to have what's

24   called essentially a single entity.  What that means is that as

25   a steward of federal funding or governmental funding, you want

1   to ensure that your recipient is not kind of commingling these

2   funds.

3      So in a larger developer, take United States Development

4   Corporation, they may have 50 projects going on.  But that

5   would make my job as a steward of federal funds very difficult

6   to monitor if there's 50 things going on.  So we require that

7   single entity LLCs be established specifically for the targeted

8   property, and that way monitoring to ensure compliance is

9   essentially made easier and more viable for government staff.

10   Q.   And with regard to this 5 May project, are you aware of a

11   single entity LLC that Mr. Levin set up for the project?

12   A.   Yes.  His initial application I believe came in under

13   Levin Development, and we required that he establish a single

14   entity LLC ultimately called 5 May Street, LLC.

15   Q.   Okay.  You talked about this very first meeting that you

16   had with Mr. Levin and Mr. Murphy and these other people.  One

17   of them was Curtis Mueller.  Did you have an understanding at

18   that meeting about what Curtis Mueller's role was?

19   A.   Not --

20      THE COURT:  Let's do this.  This is probably as good a

21   time as any to break, so hold on that answer.  I'll have you

22   re-ask that tomorrow morning.  We'll see you guys back here

23   tomorrow.  Remember not to discuss the case with anyone,

24   including each other, and of course avoid any media accounts.

25   See you tomorrow, everyone.

1          (Jury exits the courtroom.)

2          THE COURT:  How long?

3          MR. GRIFFIN:  I'm bad at this.  An hour,

4   hour-and-a-half-ish.

5          THE COURT:  Who has it, you?

6          MS. DINEEN JERRETT:  I have it, Your Honor.  I have no

7   idea at this point.

8          THE COURT:  Okay.  See you tomorrow.

9          (Recess, 1:00 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3            I, Kelly Mortellite, Registered Merit Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter to the best of my skill and ability.

9                    Dated this 24th day of July, 2021.

10

11                   /s/ Kelly Mortellite

12                   _____

13                   Kelly Mortellite, RMR, CRR

14                   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25